**CITY OF HOUSTON, Appellant,**

**v.**

**Wesley WEST et ux., Appellees.**

**No. 16355.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Aug. 8, 1974.

Rehearing Denied Oct. 3, 1974.

Jonathan Day, City Atty., Fred R. Spence, Sr., Asst. City Atty., Houston, for appellant.

Andrew J. Lannie, Baytown, William E. Watson, Jr., Houston, for appellees.

PEDEN, Justice.

This is an eminent domain proceeding brought by the City of Houston in Harris County Court at Law to condemn a 20.699 acre tract of land within the security fence of William P. Hobby Airport. Mr. and Mrs. Wesley West, owners of the property, timely filed their objections to the award of the special commissioners. The City's right to condemn the property was stipulated to, and the only contested fact issue was the value of the land taken. Upon final hearing the jury awarded the Wests $901,647 for the land.

By its first point of error the City alleges that the trial court should have granted its motion to transfer the case to a district court because defendant's exhibit No. 2 was an instrument affecting title to the land being acquired and the county court at law has no jurisdiction to determine title to land or pass on the admissibility of instruments affecting title to land. The City's second and third points of error contend that the trial court erred in admitting defendants' exhibit No. 2 because it is an unfulfilled agreement between the City, John Mecom and the Wests, because the

Wests did not perform their obligations as required by the contract, and such obligations amounted to a condition precedent to the granting of the easement in question, because the instrument granted no easement and because it violated the rule against perpetuities.

Under the provisions of the contract admitted in evidence as defendants' exhibit No. 2, Mr. Mecom and the Wests had agreed in 1966 to convey "Tract One" to the City for $66,000, had consented to the abandonment of Avenue A and the parties had agreed to exchange certain other tracts in the area; in addition the City had agreed to grant to Mecom-West a 60 foot roadway easement over "Tract Five" and agreed that the City would construct and permit the nonexclusive use by Mecom-West of a public taxiway from the Mecom-West property to Hobby Airport's runway system, subject to certain provisions set out in the agreement. The provisions concerning the construction of the taxiway were:

II.

"Mecom-West agrees to contribute to the City the total payment received by Mecom-West from the City for Tract One, and in consideration of such contribution, the City agrees to construct a taxiway located as hereinafter stated and meeting the general standard specifications established by the Department of Public Works & Engineering for taxiways at the Houston International Airport. The City is not required to commence construction of said taxiway until it receives written notice from Mecom-West, addressed to the City's Director of Aviation and Director of the Department of Public Works & Engineering advising the City that, either or both, Mecom-West are ready to commence and will commence within sixty (60) days after construction of said taxiway, and will proceed with diligence to complete the construction of facilities on land herein described as Tract Two and/or Tract Four, which facilities will utilize said

taxiway, and upon receipt of such notice, together with the contribution by Mecom-West of the net consideration received from the City for payment of Tract One, the City of Houston shall within ninety days subsequent to such receipt of such notice commence the construction of such taxiway and diligently prosecute the same to completion. Said taxiway shall be not less than fifty (50) feet in width and shall connect the present taxiway designated as 'J.' on the William P. Hobby (Houston International) Airport, with the aforesaid property of Mecom-West at a location approximately fifty-five (55) feet west of the northeast corner of Lot 3, of Orange Dale Subdivision.

"Upon the completion of said taxiway, said taxiway may then be used for ingress and egress to the said airports for aircraft patronizing businesses and business establishments and receiving services located on Tract Two and/or Tract Four, herein described, and for no other purpose, and to serve no other land not owned by the City, except with the written consent of City Council."

The contract further provided:

"For so long as taxiway access is permitted and used under the terms of this agreement from TRACTS TWO and FOUR to the Airport and as a covenant running with said land, MECOM-WEST hereby agree with respect to the use of TRACTS TWO and FOUR and any other properties now or hereafter owned by MECOM-WEST (or their successors in interest to TRACTS TWO and FOUR) within the property constituting the William P. Hobby (Houston International) Airport, as follows: . . ."

Among the items listed were provisions that a) all rules, regulations and orders of the Federal Aviation Agency applicable to use of the airport shall be applicable to the lands of Mecom-West, b) Mecom-West will pay to the City all fees and taxes due on their property and applicable generally to users of the airport and c) certain types of business shall not be conducted on their property.

Article VII of the contract provided that the City had the option to suspend the right of use of the taxiway by Mecom-West or by any of their tenants, lessees or users of the land in question in the event of a continuing breach of the provisions of the contract after notice.

Article VIII provided:

"MECOM and WEST shall have the right to use said taxiway for a period of thirty (30) years from the date that said taxiway is completed and accepted by the CITY as having been completed in accordance with the plans and specifications for the construction thereof, subject to suspension as above provided in Article VII. The CITY shall maintain said taxiway as any other taxiway on said airport. Such taxiway shall not be used by MECOM or WEST, or any assignee, sublessee, licensee or permitee of MECOM or WEST for any purpose or use prohibited either expressly or impliedly under the provisions hereof."

It was established that prior to the institution of these condemnation proceedings the parties had executed conveyances and had substantially performed their obligations under the contract. The only provisions which had not been performed were those pertaining to the construction and use of the taxiway.

Prior to institution of these proceedings, Mr. Mecom and the Wests had divided Tract Two, and the subject property constitutes the easterly half of it. Mr. Mecom had conveyed the westerly half of Tract Two to the City.

The City contends that there is a controversy regarding a genuine issue of title to land that would require transfer of the case to the district court under Section 4 of Article 3266a, Vernon's Ann.Texas Civil Statutes, which provides:

"In any eminent domain case pending in the county court at law, whenever the

judge of the court determines that the controversy involves *a genuine issue of title* or any other matter which cannot be fully adjudicated in county court at law, he shall transfer the case to the district court." (emphasis added)

■ The title to the land being acquired by condemnation was not in controversy. The contract had been substantially performed and apparently was in full force and effect until the City undertook to condemn the Wests' property. It was not shown that any steps had been taken to have the contract terminated or rescinded by agreement or by court action. The Wests were entitled to have the jury consider the benefit to the value of their land by reason of the unilateral option obtained through the contract to have the City build a taxiway from the subject property to the airport runways.

The City claims the Wests have no easement from their property to the airport's runway system. Appellees characterize their right as one of access to that system.

The measure of damages to be awarded the Wests was the market value of the property, at the time it was taken, in the market where it is located.

Access to Hobby Airport's runway system would obviously affect the value of the land in question. The right of ingress and egress may add value to property without involving title. See Baker Bros. Nursery v. State, 357 S.W.2d 163 (Tex. Civ.App.—Forth Worth 1962, rev. on other grounds 366 S.W.2d 212) ; Gaither v. State, 461 S.W.2d 245 (Tex.Civ.App.1970, writ ref. n. r. e.).

■ We hold that the trial judge did not err in declining to find that this cause involved a genuine issue of title that would require the case to be transferred to district court.

■ All of the real estate appraisers who testified at the trial, both the City's and the Wests', considered that the 1966 agreement (D–2) granted the property access to the runways. The expert witnesses as to value were questioned extensively by both sides about the effect of the contract. We hold that the trial court did not err in admitting the contract in evidence.

■ In State v. Reece, 374 S.W.2d 686, 688 (Tex.Civ.App.1964, no writ), we held, at page 688, that the trial court erred in excluding a recorded deed restriction which limited the use of the subject property to residential purposes, concluding that the "market value of the property would be affected by such restrictions in all probability so long as they had not been terminated as provided in the instrument creating them, or otherwise legally terminated." We hold that until terminated the option provisions in our case similarly affect the market value of the Wests' land.

The contract had been substantially performed, and the contract did not fix a time limit to the Wests' unilateral option to have the City build the taxiway. Although they had not exercised their option when the City terminated their rights under it by instituting these condemnation proceedings, they were entitled to have the jury consider it in evaluating the land.

We overrule points of error one through three.

By its 24th point of error the City alleges that the trial court erred in allowing Mr. West's appraisal witness, George Reed, to testify to the values of the land based on the income approach to valuation because that approach is not applicable to vacant, unimproved land.

"The true inquiry is not limited to what a particular person could exact as income, but is to determine the fair market value of such property—that is, what it would bring on the open market in a transaction between a willing seller and a willing buyer. . . . Evidence should be excluded relating to remote, speculative, and ·conjectural uses. . . ." *Texas Electric Service Compa-*

ny v. Linebery, 162 Tex. 570, 349 S.W.2d 105, 106 (1961).

The income approach is one of three approved methods of appraising the market value of property. The City objected to Mr. Reed's testimony that the income approach was the best method to determine the value of Mr. West's property on the ground that the property was vacant and had never been income producing property.

Mr. Reed was shown to be qualified as an expert witness to testify as to the market value of the property. He stated he considered all three approaches (market data approach, cost approach, and income approach) and his opinion was that the income approach offered the most valid data in the valuation process,

"Primarily because there is a great deal of information available to the appraiser regarding the income data.

"This is not always true. Many properties are next to impossible to estimate the rental value because you can't find similar properties that are being rented on the open market. In this case, however, the City of Houston has rented many, many sites, in the Airport itself, both at this airport (Hobby) and Intercontinental Airport. Therefore, similar properties and their rent values can be ascertained from the records."

Mr. Reed testified that except for the subject property, all of the land located within the security fence at Hobby Airport is owned by the City, and he pointed out that much of it is leased to persons or companies who then build structures on it having access to taxiways and runways.

▆▆ Although no case has been cited to us in which a Texas court has allowed or excluded the income approach for valuing vacant lands, we cannot say under this evidence that the trial court abused its discretion in admitting Mr. Reed's opinion testimony as to the market value of the subject unimproved land based on the income approach to value. Where, as here, an expert real estate appraiser finds rental data of comparable properties more readily available than sales data, and concludes that it offers a better indication of market value, we see no logical basis for applying the income approach to the valuation of buildings and denying it to that of vacant land. Appellant does not contend that the income approach is not applicable in Texas to assist in determining the market value of improved property. The only evidence of valuation that must be excluded is that which is too remote, speculative or conjectural. See Johnson v. State, 474 S.W.2d 327 (Tex.Civ.App.1971, writ ref. n. r. e.).

"If the situation, quality, and character of the property are such as make it peculiarly adapted to a certain purpose, and give it an especial value for that purpose, then damages should be assessed with a reference to its adaptability to that purpose. . . . 'Value is not to be estimated solely from the use made of the land at the time of seizure, but the use to which it is adapted may properly be taken into account in determining what would justly compensate the owner of the land seized, since the use to which the property is adapted may exert an important influence upon its market value. The estimate of value should be based on the use which men of ordinary prudence and sagacity would make of the land. Future contingent value cannot be considered, and yet it is not improper to consider the surroundings of the property, and the probability that a use may reasonably be made of it more profitable than that to which the owner has devoted it.'" Sullivan v. Missouri, K. & T. Ry. Co. of Texas, 68 S.W. 745, 746 (Tex. Civ.App.1902, no writ). Also Foley Bros. Dry Goods Co. v. Settegast, 133 S.W.2d 228, 231 (Tex.Civ.App.1939, writ ref.).

The income-producing potential and capacity of comparable tracts were noted by Mr. Reed and he applied that data in estimating the market value of the West tract.

Mr. Reed used an approved method of appraisal and we perceive no reason why vacant land for which there is some demand as rental property may not be appraised by the income approach. Mr. Reed's testimony was somewhat conflicting as to demand for a lease on the subject property, but it is clear that many other tracts near the two airports are under lease. He said that "no tract of twenty acres has been developed as a unit, but that doesn't mean there's no demand. If there was no demand for the twenty acres, the City wouldn't want it." Where this method is applicable and accurately evaluates the property it is a permissible method to use. See 23 A.L.R.3d 729, § 4. We overrule Point 24.

An integral part of the income approach is the capitalization rate. The City's 25th point of error complained of allowing Mr. Reed to testify that he averaged various investment rates as a means of arriving at a capitalization rate of 7 percent.

Mr. Reed related that he had recently negotiated leases applying a capitalization rate of 6½ percent, and that an investor would expect a one-percent greater return if he invested in land than in bonds. He averaged several different types of bonds (government securities, treasury notes, AA corporate bonds) and took into consideration the prime lending rate at the date of taking of the subject property; he said that the average rate for all these types of investments was slightly under 6 percent, and one percent added for land would total 7 percent.

■ This testimony is the factual basis upon which Mr. Reed arrived at a 7 percent capitalization rate. The factual basis which an expert witness used to reach his valuation is admissible. State v. Oakley, 163 Tex. 463, 356 S.W.2d 909 (1962); Hays v. State, 342 S.W.2d 167 (Tex.Civ. App.1960, writ ref. n. r. e.). The jury was not bound by Mr. Reed's testimony as the City seems to contend, but chose to believe the accuracy of his rate rather than the 13 percent capitalization rate used by the City's expert witness.

Mr. Reed used eleven leases at Hobby and Intercontinental Airports as a basis for establishing the second element of the capitalization rate, the rental value of the property. The City attacked the admissibility of these leases on the grounds that all of them were from the condemnor City and that the leases are not comparable either in location or size.

To support its position that sales or leases from a condemning authority are not comparable the City cites Southern Pacific Co. v. State, 438 S.W.2d 413, 417 (Tex.Civ. App.1969, no writ). The entire holding of the court on this point was as follows:

"Appellant alleges error in the action of the trial court in refusing to admit into evidence as a comparable sale, the sale of a certain piece of property. We feel that this point must be overruled because the sale was by a condemning authority. This matter was brought up and objected to by the State, and the court sustained the objection. The appellant apparently did not take exception to the court's ruling and did not perfect a bill of exception, and therefore, in our opinion, has waived said point. Appellant's Point 2 is accordingly overruled."

The thrust of the holding seems to be that appellant waived the point on appeal.

The rule that sales to a condemning authority are not comparable and therefore inadmissible is not challenged. The rationale behind this rule is clear, that the impartial test of a willing seller and willing buyer neither being forced to act is jeopardized by the knowledge that, when buying, the condemning authority may institute condemnation proceedings if it does not like the offered price. This advantage is not present when the condemning authority is the seller, and there ordinarily is no compelling force to cause a buyer to purchase property from a condemning authority. This statement is also true for leases.

There was no showing of any compulsion upon the lessees to lease from the City except that if they wanted to do business around the airport they had to lease from whoever owned the land. The fact that the City had a virtual monopoly on the land, except for the West tract, still does not force the lessees to lease the land inside the airport boundaries. The City was willing to lease the land, the eleven lessees were willing to rent it, and neither side appears to have been forced into the arrangement.

The City also contends that the eleven leases were not comparable in location and that nine of them were not comparable in size. Three of the leases were within the perimeter fence of Hobby Airport. They had been vacant at the time they were leased and had access to paved taxiways and runways. The remaining eight leases were within the perimeter of Intercontinental Airport; they had also been vacant when they were leased and had access to paved taxiways and runways. At both airports the leased properties had access to paved airport roadways. The West property is vacant, appears to have the right to access to taxiways and runways through defendants' exhibit number 2, and has a 60 foot by 550 foot easement to Avenue B on the south side of Hobby Airport.

The three leases at Hobby which the City claims are not comparable in size range from 1.53 acres to 1.904 acres, and the six leases at Intercontinental complained of range from 1.23 acres to 4.85 acres. Clearly, they are considerably smaller than the Wests' 20.699 acre tract.

The City's first complaint as to the location of the leases was that the leases at Intercontinental was geographically too far from the site of the tract in question. The Supreme Court in City of Austin v. Cannizzo, 267 S.W.2d 808, 815 (Tex.1954), stated that the test of comparability was not purely geographical:

"As bearing on the existence of a market for the property involved, and of its market value, evidence of recent sales of comparable property should not be restricted to the narrow area west of Kinney Avenue and South of Barton Springs Road. Evidence of recent sales of other property in the City of Austin, meeting the test of similarity, should be admitted."

See also State v. Arthur, 435 S.W.2d 577, 581 (Tex.Civ.App.1968, no writ).

The trial court is vested with considerable discretion in determining the admissibility of allegedly comparable sales. State v. Hays, 361 S.W.2d 401, 403 (Tex.Civ. App.1962, writ ref. n. r. e.); Holcombe v. City of Houston, 351 S.W.2d 69, 73 (Tex. Civ.App.1961, no writ); State v. Arthur, supra, 435 S.W.2d at 581. Mr. Reed used data from these leases, not as primary evidence of value, but to show the basis which he used, as an expert, to arrived at his opinion of the value of the land. The trial court is allowed even broader discretion in this situation than where the sale or lease data was supplied as primary evidence of value. State v. Hays, supra.

■ We stated in Holcombe v. City of Houston, supra 351 S.W.2d at p. 72:

"As to comparability, appellant in effect urges there must be practical, if not absolute, identity in shape, area and environment. There is no such legal requirement. The law does require comparability but not that the tracts be identical. Comparability is a relative term and is used in cases of this kind more in the sense of similarity to such degree that the sales price of one will be an indication of the value of the other and will thus assist in determining the value of the tract in question."

We further held that a most important factor is similarity of environment. All the leases used in the present case are within the perimeter of the two major airports in Harris County. Mr. Reed testified that in his opinion the highest and best use of the subject property would be for airport serv-

ice facilities and that there was a need for such facilities on the date of taking. The land rentals he testified about were being paid by the operators of airlines and of airport service facilities. This is an unique environment, including only the leased property and the West tract. As to comparability of locations, there was no abuse of discretion in admitting these leases into evidence.

■ As to size, again the court is vested with broad discretion. The City cites State v. Chavers, 454 S.W.2d 395 (Tex. 1970); State v. Willey, 360 S.W.2d 524 (Tex.1962), and City of Austin v. Cannizzo, supra, as supporting its position that the size of the leased tracts is not comparable. *Chavers* was reversed because of a comparison of improved land with unimproved land, not because of size differentials. *Willey* and *Cannizzo* were reversed because of a comparison of subdivided land with unsubdivided land, not because of size differentials. In the other cases cited by the City, where evidence was excluded because of size differentials, the appellate courts upheld the exclusion and the trial court's discretion. We hold that the trial court did not abuse its discretion in admitting in evidence the lease data as to both small and large tracts. See Ford v. State, 432 S.W.2d 720 (Tex.Civ.App.1968, no writ).

It is true that the leased tracts had improvements upon them when the City took the Wests' land, but it is undisputed that when the respective leases were executed such tracts were vacant; there was no attempt to compare unimproved with improved tracts.

While Mr. Reed stated he felt the income approach was the best method to value the West tract, he was also asked questions on direct examination concerning the comparable sales or market data approach. The City objected and preserved error regarding the admission of evidence as to four

sales as not being comparable in location to the subject property.

■ These properties were not within the perimeter of Hobby but were within the general vicinity of the airport. They were on heavily traveled roads. We cannot say that the admission of the sales was an abuse of the trial court's discretion.

■ The City next complains of the statement made by Mr. West's counsel on voir dire:

"The power of the City to take this land from the Wests is not being questioned. The Wests don't like it, but there is no way to stop it."

The City objected to this comment, the court sustained the objection and instructed the jury not to consider the remark, then overruled the City's motion for new trial. The statement, if error, was corrected by the instruction and is harmless. It is not reversible error to tell a jury that which it knows or can easily deduce. See State v. Willey, 351 S.W.2d 907 (Tex.Civ. App.1961, no writ).

Points 32 and 33 complain of an additional comment by the trial judge, and his failure to grant a second motion for mistrial after the statement. None of this appears in the record before us. The City's Bill of Exceptions #2 makes no mention of a second motion for mistrial. The trial judge had no recollection of any comments the court made and did not certify that these comments were made.

These points are not properly before us and are overruled.

Point of error 34 stated that the trial court erred in allowing Mr. Reed to testify that the City discriminated against its tenants as well as the public. The word "discriminated" is that of Mr. Spence, the City's counsel, not Mr. Reed. Mr. Reed never did use the word. Apparently he

was referring to the restrictive provisions of the City's standard lease agreements, and the fact that the West property was not bound by these restrictions. We find no merit in this point of error.

■ The City also complains that Mr. Reed was allowed to testify that his appraisals in other cases had been upheld by appellate courts. Such bolstering of a witness is improper.

It was objected to and the objection was sustained on direct examination. Upon cross-examination the City's counsel engaged in extensive questioning concerning Mr. Reed's testifying in previous trials and whether he came into the cases before the lawsuits had been filed. The City also brought out that had he not testified in this case on the day it was heard he would have been in Austin testifying in another condemnation case. It was on redirect examination that the testimony complained of was elicited without objection. Mr. West contends that the City invited error by trying to show that Mr. Reed instituted lawsuits.

We find no justification for this improper conduct by appellees' counsel, but we do not believe that it caused the rendition of an improper judgment.

The City asserts jury misconduct in that in arriving at the capitalization rate the jury received uncontradicted unsworn testimony from one of the jurors relating to her personal experience and knowledge as to what the capitalization rate was.

■ The test for reversible jury misconduct is that 1) the misconduct complained of in fact occurred, 2) it was material and 3) was calculated to, and probably did, result in harm to the appellant. Rule 327,

Texas Rules of Civil Procedure; Crawford v. Detering Co., 150 Tex. 140, 237 S.W. 2d 615, 617 (1951).

By the City's bill of exception number one, testimony elicited from one of the jurors at the hearing on the motion for new trial, the City showed that one juror, Cathey Dillard, testified that the jury used the income approach to reach its valuation figure. All the jurors agreed upon 7 cents per square foot as the rental value of the land and five of the six jurors agreed upon 7 percent as the capitalization rate, with the sixth believing it should be higher. At this point one of the jurors said she had read up on it, that the capitalization rate was about 7 percent and that she felt "real good" about the 7 percent capitalization rate. Subsequent to these comments the dissenting juror came down to the 7 percent capitalization rate, and the verdict was unanimous.

■ The comment of the juror added nothing to the evidence already adduced at the trial. A statement by a juror that he feels good about his answer does not amount to unsworn testimony. The statement that the juror had read up on the rate and that it was about 7 percent, while improper, did not cause the rendition of an improper verdict.

■ The City also objected to that portion of the court's definition of market value which says: ". . . in all reasonable probability will become available within in the reasonable future."

Since this exact language is expressly approved, we overrule this point on authority of City of Austin v. Cannizzo, supra.

Affirmed.