### TRAVIS CENTRAL APPRAISAL DISTRICT, Appellant,

v.

### FM PROPERTIES OPERATING COMPANY, Appellee.

No. 03–96–00043–CV.

Court of Appeals of Texas, Austin.

June 26, 1997.

Rehearing Denied July 24, 1997.

---

Judith A. Hargrove, Calame, Linebarger, Graham & Pena, L.L.P., Austin, for appellant.

William Ikard, Popp & Ikard, Austin, for appellee.

Before POWERS, ABOUSSIE and JONES, JJ.

JONES, Justice.

FM Properties Operating Company ("FM"), appellee, sued the Travis Central Appraisal District ("the District"), appellant, challenging an order of the District's Appraisal Review Board that appraised, for ad valorem taxation purposes, the value of real estate owned by FM. Relying on section 23.12(a) of the Texas Tax Code, which requires that real estate inventory be valued as a unit, FM claimed the District's assessment based on individual lot values was excessive. *See* Tex. Tax Code Ann. § 23.12(a) (West Supp.1997) (hereinafter "Code"). The District answered by (1) challenging the trial court's jurisdiction to entertain the suit because FM had not paid the disputed taxes before filing suit, as required by section 42.08 of the Code; and (2) counterclaiming for a declaratory judgment that section 23.12(a) is unconstitutional. FM responded by seeking a declaratory judgment that section 42.08 is unconstitutional. After a trial to the court, the trial court rendered judgment for FM, ruling that section 23.12(a) is constitutional and that section 42.08 is unconstitutional. The District perfected this appeal. We will affirm.

## FACTUAL BACKGROUND

FM is in the business of purchasing raw land or developed lots to sell to builders, who then build homes on the land as part of the development of a subdivision. On January 1, 1993, FM owned a total of 210 residential lots in four subdivisions; on January 1, 1994, FM

owned a total of 153 residential lots in three subdivisions. All of the lots were held by FM for sale in the ordinary course of its business, had not been occupied, leased, or rented, and produced no income during FM's ownership. The parties stipulated that (1) if section 23.12(a) of the Code is constitutional, an appraisal of FM's properties as a unit pursuant to that statute would yield market values of $9,933,326 for the tax year 1993 and $6,670,193 for the tax year 1994; and (2) if section 23.12(a) is unconstitutional, the sum of the individual lot values of FM's parcels would yield total market values of $13,932,875 for the tax year 1993 and $10,755,881 for the tax year 1994.

## DISCUSSION

In point of error two, the District contends the trial court erred in declaring unconstitutional section 42.08 of the Code, which requires that a taxpayer pay the previous year's real property assessment as a condition for obtaining judicial review. The Texas Supreme Court's recent decision in *Central Appraisal District v. Lall*, 924 S.W.2d 686 (Tex.1996), holding section 42.08 unconstitutional, is dispositive on this issue. We overrule point of error two.

In point of error one, the District asserts that section 23.12(a) violates the Texas Constitution. The relevant portion of section 23.12(a) provides:

> [T]he market value of an inventory is the price for which it would sell as a unit to a purchaser who would continue the business. An inventory shall include residential real property which has never been occupied as a residence and is held for sale in the ordinary course of a trade or business, provided that the residential real property remains unoccupied, is not leased or rented, and produces no income.

Code § 23.12(a).[1] The District contends section 23.12(a) violates article VIII, sections 1 and 2 of the Texas Constitution, which provide:

**§ 1. Equality and uniformity; tax in proportion to value; income tax; exemption of certain tangible personal property from ad valorem taxation**

Sec. 1. (a) Taxation shall be equal and uniform.

(b) All real property and tangible personal property in this State, unless exempt as required or permitted by this Constitution, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value, which shall be ascertained as may be provided by law.

\*   \*   \*   \*   \*   \*

**§ 2. Occupation taxes; equality and uniformity; exemptions from taxation**

Sec. 2. (a) ... [T]he legislature may, by general laws, exempt from taxation [various types of property specifically described in this section]; and all laws exempting property from taxation other than the property mentioned in this Section shall be null and void.

Tex. Const. art. VIII, §§ 1, 2. The District asserts that section 23.12(a) violates the "equal and uniform" and "in proportion to its value" requirements contained in section 1 and constitutes an unauthorized exemption from taxation under section 2.

In two recent opinions, the Texas Supreme Court summarized the rules for determining the constitutionality of a taxation statute:

> In determining the constitutionality of a statute, we begin with a presumption that it is constitutional. Courts presume that the Legislature "understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its

---

1. Amendments to section 23.12(a) in 1993 and 1995 resulted in the addition of the introductory phrase, "Except as provided by Sections 23.12A and 23.12D of this code...." *See* Act of May 25, 1993, 73d Leg., R.S., ch. 672, § 1, 1993 Tex. Gen. Laws 2501, 2501; Act of May 27, 1995, 74th Leg., R.S., ch. 836, § 1, 1995 Tex. Gen. Laws 4231, 4231. Section 23.12A, since renumbered as section 23.121, provides: "For the purpose of the computation of property tax, the market value of a dealer's motor vehicle inventory on January 1 is the total annual sales from the dealer's motor vehicle inventory, less sales to dealers, fleet transactions, and subsequent sales, for the 12–month period corresponding to the prior tax year, divided by 12." Code § 23.121(b) (West Supp.1997). Section 23.12D provides the same method of computation of value for a dealer's vessel and outboard motor inventory. *See* Code § 23.12D(b) (West Supp.1997).

discriminations are based upon adequate grounds." The wisdom or expediency of a law is for the Legislature to determine, not this court. Furthermore, the party challenging the constitutionality of a statute bears the burden of demonstrating that the enactment fails to meet constitutional requirements.

*Enron Corp. v. Spring Indep. Sch. Dist.,* 922 S.W.2d 931, 934 (Tex.1996) (citations omitted) (quoting *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968)).

We presume that a statute passed by the Legislature is constitutional. Furthermore, this Court must liberally construe any constitutional provision that directs the Legislature to act for a particular purpose, and we must, if possible, construe statutes to avoid constitutional infirmities. Finally, we must reject interpretations of a statute that defeat the purpose of the legislation so long as another reasonable interpretation exists.

*Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 662 (Tex.1996) (citations omitted).

In *Enron,* the supreme court addressed an identical constitutional challenge to a taxation statute that is closely related to the one at issue here. Section 23.12(f) of the Code permits "[t]he owner of an inventory" to elect to have its inventory "appraised at its market value as of September 1 of the year preceding the tax year to which the appraisal applies" instead of January 1 of the tax year, the date when all other property must be appraised for ad valorem tax purposes. In upholding the constitutionality of the statute, the court held that "the Legislature may constitutionally draw distinctions in the manner in which market value of property is determined for ad valorem tax purposes, as long as the classifications are not unreasonable, arbitrary, or capricious." 922 S.W.2d at 936. In the present case, therefore, the touchstone for the District's constitutional challenge is whether section 23.12(a) creates a valuation method for inventory that is unreasonable, arbitrary, or capricious.

■ For ad valorem tax purposes, "value" must be based on "reasonable market value." *Nootsie,* 925 S.W.2d at 661; *Enron,* 922 S.W.2d at 935. The Code defines "market value" as:

the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:

(A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser;

(B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and

(C) both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other.

Code § 1.04(7) (West 1992). This statutory definition, first enacted in 1979, accords with the traditional definition applied by Texas courts that market value means the price property would bring when offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it. *See State v. Windham,* 837 S.W.2d 73, 77 (Tex.1992); *Polk County v. Tenneco, Inc.,* 554 S.W.2d 918, 921 (Tex. 1977); *City of Pearland v. Alexander,* 483 S.W.2d 244, 247 (Tex.1972); *Humes v. Hallmark,* 895 S.W.2d 475, 480 (Tex.App.—Austin 1995, no writ). *See generally* Gary A. Goff, Comment, *Fair Market Value: A Primer for Texas Legal Practice,* 15 Tex. Tech L.Rev. 637, 639–43 (1984).

The Code also provides:

The market value of property shall be determined by the application of generally accepted appraisal techniques, and the same or similar appraisal techniques shall be used in appraising the same or similar kinds of property. However, each property shall be appraised based upon the individual characteristics that affect the property's market value.

Code § 23.01(b) (West 1992).

The District complains that section 23.12(a): (1) violates the "equal and uniform" requirement of article VIII, § 1(a) of the constitution by treating some owners of real

property (those whose property comes within the statutory description of "inventory") differently from other owners of real property; (2) violates the "in proportion to its value" requirement of article VIII, § 1(b) by imposing a valuation methodology that does not yield market value; and (3) violates the exemption provision of article VIII, § 2(a) by exempting from taxation certain real property that is not mentioned in that section. We will address the District's arguments in that order.

## I. Equal and Uniform

The District's primary complaint about section 23.12(a) is that it discriminates against the owners of real estate whose property does not satisfy the prerequisites of "inventory" set out in the statute. The District argues that, by treating owners of real estate inventory differently from owners of other real property, the statute violates the constitutional requirement that taxation be "equal and uniform." On essentially the same basis, the District argues that section 23.12(a) is arbitrary and capricious.

■ To the extent the District is arguing that section 23.12(a) is per se unconstitutional merely by virtue of creating a classification scheme wherein owners of real estate inventory are treated differently from owners of other real property, this argument has been foreclosed by *Enron*. The foundational holding of *Enron* was that "the Legislature has the authority to establish a method of determining the market value of inventory that differs from the method of valuing other property for ad valorem tax purposes...." 922 S.W.2d at 941. As to the present complaint, therefore, the District can prevail only by showing that the particular method of determining the market value of inventory mandated by section 23.12(a) is unreasonable, arbitrary, or capricious. Accordingly, the features of that method must be examined.

■ The first sentence of section 23.12(a) requires that the market value of *any* inventory—whether real or personal property—be determined by the price for which the property would sell "as a unit to a purchaser who would continue the business," i.e., the business of selling whatever goods make up the inventory. The term "inventory" is not defined in the Code, but it is clear from the context that the legislature meant the stock of goods on hand being held for sale in the regular course of a business. *Cf.* Tex. Bus. & Com.Code Ann. § 9.109 (West 1991). The second sentence of section 23.12(a) establishes the prerequisites for including real property in the category of "inventory": (1) residential real property that (2) has never been occupied as a residence, (3) is held for sale in the ordinary course of a trade or business, (4) remains unoccupied, (5) is not leased or rented, and (6) produces no income. To the extent the first sentence of section 23.12(a) relates to *personal* property, the District makes no complaint. Indeed, the District concedes that "it may be reasonable to classify personalty held in inventory as 'inventory' and allow bulk appraisal of such property for tax purposes." Nor does the District complain about the criteria in the second sentence by which it is determined whether specific real property constitutes inventory. Rather, the District argues generally that a separate classification for inventory, whereby inventory is appraised as a unit, cannot be applied to real property at all. The District asserts that the market value of the whole property can be determined only by finding the market value of each individual lot and then adding those values together. We reject the District's argument.

The "unit" method of valuation imposed by section 23.12(a) is supported by generally accepted appraisal techniques that have been approved by numerous courts and commentators. Professional appraisers typically value multiple unimproved lots in a subdivision—or potential subdivision—as a unit, utilizing the so-called "development approach."[2] *See* J.D. Eaton, *Real Estate Valuation in Litigation* 201–25 (Amer. Inst. Of Real Estate Appraisers 1982); Stephen Le-

---

2. The development approach has also been variously referred to as the "cost of development method," "anticipated use method," "lot method," "developer's residual approach," "develop-

er's absorption method," and "subdivision approach." For purposes of consistency only, we will refer to it as the development approach.

roy Angell, *Appraisal of Subdivisions, in Encyclopedia of Real Estate Appraising* 483–509 (Edith J. Friedman ed.1959); *see also The Appraisal of Real Estate* 49–50 (Amer. Inst. of Real Estate Appraisers, 8th ed.1983); *Real Estate Appraisal Terminology* 11–12 (Amer. Inst. of Real Estate Appraisers & Soc'y of Real Estate Appraisers, Byrl N. Boyce ed.1975) (defining "anticipated use method"). In applying the development approach to raw land that is not yet fully subdivided, the procedural steps generally used by appraisers are as follows:

1. Prepare subdivision layout to determine number, size, and shape of typical lots.

2. Estimate retail value of lots.

3. Estimate direct development costs.

4. Estimate indirect development costs.

5. Compute income residual to developer's profit and land (Step 2 minus Steps 3 and 4).

6. Deduct developer's profits from Step 5.

7. Estimate the amount of time required to develop and sell out the subdivision.

8. Discount anticipated income stream into a current indicated raw land value.

Eaton, *supra,* at 223. Although the development approach is often utilized to determine market value for raw land that is not yet subdivided, as for example where it is shown that residential subdivision is a tract's highest and best use, it is even better suited for a tract of land that is already fully subdivided, because the existence of an actual subdivision layout makes step 1 unnecessary and makes the figures obtained from steps 2, 3, 4, and 7 more reliable.

[For land that has been fully subdivided,] [t]he problems involved in the partially developed subdivision have evaporated. The costs to the developer are no longer speculative, the value of the individual lots in the market may be ascertained with as much certainty as in any other condemnation proceeding, and the possibility of such a use is no longer remote.

Eaton, *supra,* at 212 (quoting 4 *Nichols on Eminent Domain,* § 12.3142[1][d] (rev.3d ed.1979, Julius L. Sackman, co-author)).

■ For purposes of the present case, the significance of the development approach is that it acknowledges the propriety of valuing a subdivided tract as a unit, so that the retail price at which individual lots will be sold is only one of several factors to be considered. Professional appraisers recognize that, although the retail price of individual lots should be considered, direct and indirect development and marketing costs must also be considered in order to find true market value:

Another terminology problem involves use of the terms *retail value* and *gross sellout value.* These terms do not identify value estimates; they represent the total gross receipts expected to be produced by the project. Value is a point-in-time estimate, based in part on the theory that the value of any good or service is the present value of the future benefits to be derived from its ownership. Since arriving at a *gross sellout value* does not involve consideration of the expenses of disposition or holding or the calculation of present worth, gross sellout value is not a value estimate. Labeling expected gross receipts as any kind of value estimate is highly misleading and should be avoided.

Douglas D. Lovell and Robert S. Martin, *Subdivision Analysis* 61 (Appraisal Inst. 1993). A paramount concept to be gleaned from this passage is that value is a point-in-time estimate. The notion of market value, therefore, necessarily refers to what a purchaser would pay for property at the present time in a single transaction, not what might be paid by dozens or even hundreds of purchasers if the property were sold in pieces over an extended period of time.

Courts and commentators have also recognized and approved the development approach for appraising the value of a tract of land that has been—or is expected to be—subdivided into smaller parcels. Questions of valuation of land often arise in eminent domain cases, in which the respective positions of the landowner and the government are opposite from tax cases. In eminent domain cases, the landowner rather than the taxing authority attempts to show the highest value possible. In such cases, courts

permit the landowner to present evidence of individual lot values *only* in conjunction with evidence of development and marketing costs:

> [T]he better view ... is that a lot method appraisal can be admitted in appropriate cases if the proponent offers credible evidence of the costs of subdivision—*e.g.*, the expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold.

*United States v. 47.3096 Acres, Etc., in Oxford Township,* 583 F.2d 270, 272 (6th Cir. 1978); *see also United States v. 99.66 Acres of Land,* 970 F.2d 651, 655 (9th Cir.1992); *United States v. 100 Acres of Land, More or Less, in Marin County,* 468 F.2d 1261, 1266–67 (9th Cir.1972); *United States v. 147.47 Acres of Land in Monroe County,* 352 F.Supp. 1055, 1060–61 (M.D.Pa.1972); *Dash v. State,* 491 P.2d 1069, 1071–75 (Alaska 1971); *Commonwealth v. McCready,* 371 S.W.2d 485, 487 (Ky.1963); *Clifford v. Algonquin Gas Transmission Co.,* 413 Mass. 809, 604 N.E.2d 697, 702–03 (1992); *Ramsey County v. Miller,* 316 N.W.2d 917, 919–21 (Minn.1982); *Robinson v. Town of Westport,* 222 Conn. 402, 610 A.2d 611, 616 (1992).[3] At least one noted commentator has expressly approved the development approach: "In the case of land that has actually been fully subdivided, or nearly so, the courts are in agreement that the 'lot method' or 'developer's residual approach' to valuation is proper." 4 *Nichols on Eminent Domain,* § 12B.14[1][d], at 12B–180 (rev.3d ed.1997, Julius L. Sackman, co-author). In the present case, FM's appraisal expert testified that the development approach is a generally accepted appraisal technique and that he used

that approach in appraising the value of the property at issue here.

Texas courts have recognized three general approaches to determining market value: (1) the market data (or comparable sales) approach; (2) the cost approach; and (3) the income (or income-capitalization) approach. *See Religious of the Sacred Heart v. City of Houston,* 836 S.W.2d 606, 615–16 (Tex.1992); *Polk County v. Tenneco, Inc.,* 554 S.W.2d 918, 921 (Tex.1977). In addition, when circumstances dictate, the Texas Supreme Court has not hesitated to recognize alternative methods of valuation. *See Missouri–Kansas–Texas R.R. v. City of Dallas,* 623 S.W.2d 296, 299–301 (Tex.1981). These approaches are not different *definitions* of market value; they are simply different ways of arriving at an estimate of what a willing buyer would pay a willing seller.

The development approach can be viewed as merely a variation of the income approach to valuation.[4] The supreme court has stated that the income approach to valuation "proceeds on the premise that a buyer of income-producing property is primarily interested in the income which his property will generate." *Polk County,* 554 S.W.2d at 921. *See generally* Goff, *supra,* 15 Tex. Tech L.Rev. at 648–52. Since inventory is, by definition, the goods on hand being sold in the regular course of a business, any purchaser of a business's entire inventory will naturally be interested primarily in the income that the later retail sale of the inventory will generate.[5] Thus, the legislature could reasonably have decided to require use of a variation of the income approach for valuing inventory. *Cf. City of Houston v. West,* 514 S.W.2d 299, 304–05 (Tex.Civ.App.—Houston [1st Dist.] 1974), *rev'd on other grounds,* 520 S.W.2d

**3.** The development approach has been discussed in one Texas opinion, although it was not critically evaluated in that case because the parties did not contest its validity. *See Cherokee Water Co. v. Gregg County Appraisal Dist.,* 773 S.W.2d 949, 954 (Tex.App.—Tyler 1989), *aff'd,* 801 S.W.2d 872 (Tex.1990).

**4.** "Under the income approach, an appraiser or other witness calculates the economic rent the property will command in the open market, deducts normal operating expenses to arrive at net operating income, and then capitalizes the net

operating income by a rate of return to arrive at an opinion of fair market value." 5 *Nichols on Eminent Domain* § 19.01[2] at 19–8 (rev.3d ed.1997, Julius L. Sackman, co-author).

**5.** Using the income approach to find market value of real estate inventory is not inconsistent with the restriction in section 23.12(a) that the property "produce[ ] no income," because the purpose of that statutory restriction is obviously to exclude real estate that produces income *while owned.*

752 (Tex.1975) (income approach is appropriate for determining market value of raw land where data regarding potential income production is more readily available than sales data). Valuing real estate inventory as a unit is not necessarily the *only* way to determine its market value. But the example of the development approach shows that valuing such property as a unit is *one* fair and reasonable way of making that determination, thus placing the choice of valuation methods squarely in the hands of the legislature.

■ Nonetheless, the District, citing *Richey v. Moor,* 112 Tex. 493, 249 S.W. 172 (1923), argues that Texas law unswervingly requires separate valuation and assessment of separate pieces of real property. The District overstates its case. In *Richey,* the taxpayer affirmatively sought to pay taxes separately on each of seven tracts in order that any lien resulting from unpaid taxes on an eighth tract would not attach to the other seven. *Id.* 249 S.W. at 172–73. That a taxpayer might be *entitled* to pay taxes separately on different tracts, however, does not mean he is *required* to do so. The Texas Supreme Court has held that "assessment by separate tracts is for the tax payer's benefit." *French Indep. Sch. Dist. v. Howth,* 134 Tex. 211, 134 S.W.2d 1036, 1038 (1940); *see also State Mtg. Corp. v. Ludwig,* 121 Tex. 268, 48 S.W.2d 950, 953–54 (1932). This appears to be the rule in other jurisdictions as well. *See* M.C. Dransfield, Annotation, *Different Parts of Parcels of Land in Same Ownership as Single Unit or Separate Units for Tax Assessment Purposes,* 133 A.L.R. 524, 525 (1941). If a taxpayer has, for his own benefit, the "right" to separate assessment of his several properties, it would seem to follow that he also has the concomitant right to waive that benefit and to treat his own multiple lots or parcels as one unit for tax purposes.

Indeed, it appears that in some circumstances Texas law may actually prohibit landowners from valuing and assessing multiple tracts of land separately:

[A]lthough the general rule is that the taxpayer is entitled to have each separate tract or parcel of land separately valued, and assessed for taxes, and the tax lien separately fixed upon each so that one tract may not be charged or sold to satisfy the taxes upon another or other tracts (Richey v. Moor, 112 Tex. 493, 249 S.W. 172), yet it is now equally well settled that where two or more tracts or parcels are occupied and used together by the property owner for a single purpose, such as a homestead, their separate identities become merged into one by such use, and they may be valued and assessed in solido, and the tax lien may be fixed and foreclosed upon all as one parcel.

*City of Edinburg v. Magee,* 97 S.W.2d 983, 984 (Tex.Civ.App.—San Antonio 1936, no writ); *see also Manges v. Freer Indep. Sch. Dist.,* 653 S.W.2d 553, 566 (Tex.App.—San Antonio 1983), *rev'd on other grounds,* 677 S.W.2d 488 (Tex.1984); *Duval County Ranch Co. v. State,* 587 S.W.2d 436, 444–45 (Tex.Civ. App.—San Antonio 1979, writ ref'd n.r.e.), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *Moody–Seagraves Co. v. City of Galveston,* 43 S.W.2d 967, 970 (Tex. Civ.App.—Galveston 1931, writ ref'd); *cf. Electra Indep. Sch. Dist. v. W.T. Waggoner Estate,* 168 S.W.2d 645, 650 (Tex.1943). We see no reason why the legislature would not be authorized to conclude that lots held as real estate inventory are owned and used "for a single purpose."

Finally, the legislature may have concluded that valuing the inventory of a business as a unit is inherently fairer and more likely to produce true market value than other approaches such as multiplying the total number of inventory items on hand by the retail price of each individual item. For example, imagine a company that is in the business of selling widgets. The company has on hand a stock of 100,000 widgets, which retail for $2 each. Thus, the company hopes to receive $200,000 in *gross receipts* from the sale of its widgets. Assume the evidence shows, however, that in all likelihood it will take one year to sell off this entire stock of widgets; during that year, the company will likely spend $25,000 to lease a widget store, $25,000 to staff the store with salespersons, $25,000 to advertise the widgets, and $25,000 to maintain the widgets in good condition while they are waiting to be sold. Thus, the com-

pany hopes, by the end of the year, to net $100,000 profit from its widget sales (less the original cost to buy the stock of widgets). What would a reasonable, willing buyer with full information pay for the entire inventory of widgets at the beginning of the year? No more than $100,000, possibly less. Yet the simplistic method of multiplying the number of widgets on hand (100,000) by the retail sales price of each ($2) would produce a "fair market value" of $200,000, even though no "willing buyer" would pay that much for the company's inventory as a unit.

Conceptually, the valuation of real estate inventory is identical to the valuation of personal property inventory. Accordingly, the foregoing widget hypothetical can easily be applied to real estate inventory. Imagine a real estate developer who has on hand 100 lots that have been subdivided but are unimproved. The developer plans to sell each lot for $10,000, producing gross receipts of $1,000,000. Assume the evidence shows that it is predicted to take approximately two years to sell off all 100 lots; during those two years, he will spend an estimated $100,000 on a sales office, $150,000 on a sales staff, $200,000 on advertising, and $50,000 to maintain the property. Thus, by the end of the two years he hopes to net $500,000 from the sale of the lots (less the original cost the developer paid the purchase the lots). What would a reasonable willing buyer pay for those 100 lots *at the present time?* No more than $500,000, possibly less. Yet, once again, the simplistic method of multiplying the number of lots on hand (100) by the retail sales price of each ($10,000) would produce a "fair market value" of $1,000,000, even though no willing buyer would pay that much for them.

An amount that no willing buyer would pay for property is simply not market value: ·

> Market value, as determinable through application of the "willing buyer-seller test" cannot be ignored. Any method used to determine market value which produces a substantially different figure as such value is fundamentally wrong and the purported value thereby ascertained fundamentally erroneous under the Constitution and Statutes of Texas. To attribute validi-

ty thereto would be to ignore market value.

*City of Saginaw v. Garvey Elevators, Inc.,* 431 S.W.2d 575, 579 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.). In the present case, common sense alone dictates that applying the District's "number of lots times retail price of each lot" formula produces a figure grossly in excess of what *a willing buyer* would pay for FM's entire inventory of lots at a given point in time. Thus, the District's proposed method for determining the market value of FM's property is itself arguably unreasonable.

Based on the foregoing discussion, we hold that the inventory classification created by section 23.12(a) of the Tax Code is not unreasonable, arbitrary, or capricious and does not, therefore, violate the "equal and uniform" provision contained in article VIII, section 1(a) of the Texas Constitution.

## II. In Proportion to its Value

■ The District also complains that section 23.12(a) violates the constitutional requirement that property be taxed "in proportion to its value." Tex. Const. art. VIII, § 1(b). This requirement simply means that all assessed valuations must be "based upon reasonable cash market value." *Parker County v. Spindletop Oil & Gas Co.,* 628 S.W.2d 765, 767 (Tex.1982). The test for determining if a tax statute complies with this constitutional requirement appears to be substantially similar to the "unreasonable, arbitrary, or capricious" standard discussed above. *See Enron,* 922 S.W.2d at 935; *State v. Whittenburg,* 153 Tex. 205, 265 S.W.2d 569, 572–73 (1954); *State v. Houser,* 138 Tex. 28, 156 S.W.2d 968, 970–71 (1941).

In *Enron,* the Texas Supreme Court recognized that the legislature has discretion to impose different methods for determining market value: "Although the considerable leeway given to the Legislature in *levying* sales, occupation, and excise taxes is not as broad in the area of ad valorem taxes, there is no constitutional impediment to utilizing differing methods for *determining market value* for ad valorem tax purposes." 922 S.W.2d at 936. Although the supreme court did not stress it, the breadth of the legisla-

ture's discretion in the area of value determination may arise in part from the constitutional mandate that "value ... shall be ascertained as may be provided by law." Tex. Const. art. VIII, § 1(b). The phrase "as may be provided by law," when used in a constitutional provision establishing a general legal principle or administrative framework, has been held to "clearly vest[ ] the Legislature with the authority to exert substantial control over the mechanics of [the subject matter addressed]." *McAvoy v. H.B. Sherman Co.*, 401 Mich. 419, 258 N.W.2d 414, 425 (1977); *see also State v. Rodrigues*, 63 Haw. 412, 629 P.2d 1111, 1114 (1981); *Wann v. Reorganized Sch. Dist. No. 6*, 293 S.W.2d 408, 411 (Mo.1956); *State ex rel. Agnew v. Schneider*, 253 N.W.2d 184, 187 (N.D.1977); *cf. Hardin v. Central Am. Life Ins. Co.*, 374 S.W.2d 881, 884 (Tex.1964) (legislature has right to provide for method of determining valuation to be placed on assets of insurance companies for taxation purposes).

■ The District contends section 23.12(a) is constitutionally infirm because, by limiting potential purchasers to those who would continue the business of selling the goods that make up the inventory, the statute imposes an "artificial" market on the valuation of inventory that does not produce true market value. This view again appears to be based largely on the District's position that multiplying the number of subunits of property by the retail price for each individual subunit is the only way to produce a reasonable estimate of the market value of the whole. Although we have addressed that issue in the preceding section of this opinion, it is worth revisiting briefly here. Because value is a point-in-time estimate, the very concept of market value seems to contemplate what a willing buyer would pay for the whole property in a single transaction, not multiple transactions spread over time. Indeed, both the statutory and case-law definitions of "market value" refer to a *single* purchaser. *See* Code § 1.04(7); *State v. Windham*, 837 S.W.2d at 77; *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 979, 980 (Comm'n App.1936). The issue, therefore, is not whether it is reasonable to assess property as a unit. Rather, the issue is whether the process of

adding together the market values of all the subunits that make up the larger tract is, as the District contends, the *only* way to produce a reasonable estimate of the market value of the whole. In some circumstances, such an approach might be proper. But where the subunits are simply held as inventory for the sole purpose of being sold in the regular course of a business in order to produce a profit, then the value of owning those subunits arises only from the income they will produce and not from the "usual" bases of value such as the amenities and personal pleasures derived from owning and occupying the property. In those circumstances, it is neither unreasonable nor arbitrary for the legislature to require a unit valuation.

Thus, as explained above, courts, commentators, and professional appraisers generally reject the idea that simply adding together the market values of subunits will, without more, produce the market value of the whole. "The identification of the value of any given property off the market place with an amount determined by the current sale prices of units of similar property traded in on the market place, is so frankly arbitrary that it would be beside the point to argue whether or not it is a 'true' definition of value." 1 James C. Bonbright, *The Valuation of Property* 48 (1937).

Moreover, the "development approach" discussed above *does* consider the retail price of the subdivided lots. That approach merely requires that various development and marketing costs of selling the individual lots also be considered. In using the "income approach" to determine the market value of traditional income-producing property, the expenses of producing such income must always be deducted to arrive at *net* income. *See, e.g., The Appraisal of Real Estate* 362 (Amer. Inst. of Real Estate Appraisers, 8th ed.1983); J.D. Eaton, *Real Estate Valuation in Litigation* 119–20 (Amer. Inst. of Real Estate Appraisers 1982); Clifford W. Hollebaugh, *Income Approach to Value, in Encyclopedia of Real Estate Appraisal* 54–56 (Edith J. Friedman ed., 1959). Given the conceptual similarity between real estate inventory and traditional income-producing

property, applying such a requirement to real estate inventory cannot be said to be unreasonable, arbitrary, or capricious.

The constitutional issue is not simply whether section 23.12(a) restricts the market, but whether the restriction fails to produce a reasonable estimate of market value. As pointed out above, an owner of business inventory—whether real or personal property—is necessarily interested primarily in the financial benefit that the retail sale of the inventory will bring in the future. The standard definition of value applied to income-producing property is the present worth of future benefits expected to be derived from ownership: "Because value is created by the expectation of benefits to be derived in the future, value may be defined as the present worth of all rights to these future benefits. All income capitalization methods, techniques, and procedures attempt to forecast future benefits and estimate their present value." *The Appraisal of Real Estate* 408 (Amer. Inst. of Real Estate Appraisers, 9th ed.1987); *see also Real Estate Appraisal Terminology* 215 (Amer. Inst. of Real Estate Appraisers & Soc'y of Real Estate Appraisers, Byrl N. Boyce ed.,1975) ("Value is the present worth of future benefits arising out of ownership to typical users or investors."). By directing that inventory be valued at "the price for which it would sell as a unit to a purchaser who would continue the business," section 23.12(a) essentially requires nothing more than that the inventory of a business should, for taxation purposes, be considered as income-producing property and its market value determined pursuant to the income approach.

Finally, in the appraisal process, a recognition of the appropriate market is not only common, but essential:

> Although there is a remarkable similarity in the many definitions of fair market value, the definitions leave several questions unanswered. For example, the exact market to be considered to find the proper fair market value may vary depending on the nature of the property interest, the status of the owner, the volume of assets ordinarily sold, and the availability of wholesale or retail markets. The market

to be considered should generally be that which the owner of a given property would ordinarily use, but in some instances, statutes or regulations may dictate that a particular market be considered.

Goff, *supra,* 15 Tex. Tech L.Rev. at 641; *see also* Daniel S. Goldberg, *Fair Market Value in the Tax Law: Replacement Value or Liquidation Value,* 60 Tex. L.Rev. 833, 834 (1982) ("[A] determination of fair market value under the willing buyer/willing seller test cannot be made without first knowing the market in which the transaction will take place."). Where one is seeking to estimate what a willing buyer would pay for roughly 200 subdivided residential lots in a single transaction, the "retail market" would not be a good place to look. Thus, restricting potential buyers to those who would continue the business of selling the inventory to retail customers is simply a recognition that such business purchasers would pay the highest price for the inventory sold as a unit.

Moreover, to the extent it is relevant, FM produced evidence that there is an active, existing market in multi-lot sales and purchases out of subdivisions in Travis County. Thus, as far as the present case is concerned, the market designated by the legislature in section 23.12(a) is not an imaginary one, but a real one.

Based on the foregoing, we hold that the market "restriction" recognized by section 23.12(a) produces a reasonable estimate of market value and does not, therefore, violate the "in proportion to its value" provision contained in article VIII, section 1(b) of the Texas Constitution.

### III. Exemption

■ Finally, the District argues that section 23.12(a) constitutes an unauthorized "exemption" from taxation for owners of real estate inventory. Because article VIII, section 2 of the Texas Constitution does not authorize an exemption for such property, the District contends the statute is unconstitutional.

*Enron* also forecloses this argument. The supreme court held in *Enron* that a statute fixing a standard of valuation of inventory

did not create an exemption at all where the statute did not delete the property from the tax rolls entirely. 922 S.W.2d at 940–41. The present case is almost identical to *Enron* in that respect: section 23.12(a) did not delete FM's property from the tax rolls entirely, but merely established a method of valuing a certain category of property, which FM's land falls into. *See Hardin,* 374 S.W.2d at 884. Accordingly, we hold that section 23.12(a) does not violate article VIII, section 2 of the constitution.

### CONCLUSION

Because section 23.12(a) does not create an unreasonable tax classification, it does not violate article VIII, section 1(a) of the Texas Constitution; because it does not establish an arbitrary or capricious method of valuation that departs from the market-value standard, it does not violate article VIII, section 1(b); because it does not exempt real estate inventory from taxation, it does not violate article VIII, section 2. We affirm the trial court's judgment.

POWERS, Justice, dissenting.

I respectfully suggest the majority confuse the legislature's undoubted power to prescribe a *method* for appraising market value with a power the legislature undoubtedly does *not* have—a power to authorize taxation of real property on a basis *other than its actual market value.* I believe Tax Code section 23.12(a) is unconstitutional on its face insofar as the statute applies to real property.

The constitution requires that all taxable real property "shall be taxed in proportion to its *value,* which shall be ascertained as may be provided by law." Tex. Const. art. VIII, § 1(b) (emphasis added). The word "value,"

as used in this section of the constitution, means the *actual* cash market value of property. *Whelan v. State* 155 Tex. 14, 282 S.W.2d 378, 380 (1955). Unless authorized elsewhere in the constitution, the legislature is not free to provide for taxation of real property in proportion to any "value" except actual cash market value.

The term "market value" is used throughout the appraisal sections of the Tax Code with the same general meaning: "the price which a property would transfer for cash or its equivalent under prevailing market conditions ... if exposed for sale in the *open market* with a reasonable time for the seller to find a purchaser." Tex. Tax.Code Ann. § 1.04(7) (West 1992) (emphasis added). It is easy to see that this statutory definition conforms to the constitutional measure of actual cash market value. Various provisions of the Tax Code effectuate this statutory definition of market value in particular circumstances where its exact application might otherwise be uncertain.[1]

The legislature has diverged in only four instances from the constitutional measure of actual market value and the Tax Code definition of "market value" set out in section 1.04(7). In three instances the divergence results from authority given the legislature in a constitutional amendment.[2] The fourth instance is found in section 23.12(a) of the Tax Code, enacted by the legislature without an authorizing amendment to the constitution.

Section 23.12(a) applies to a limited class of real property—residential property that is new, vacant, producing no income, and "held for sale in the ordinary course of a trade or business." For this class of real property alone the Code defines the term "market

---

1. *See* Tex. Tax Code Ann. § 23.13 (leaseholds appraised at market value as such); § 23.17 (minerals in place appraised at market value as such); § 23.18 (common facilities of homeowner's organization appraised at nominal value where reflected in enhanced market value of homes); § 23.19 (incorporeal rights of exclusive occupancy and interest in common areas under Cooperative Association Act appraised at market value); § 23.83 (land restricted to recreational, park, or scenic use appraised at market value as restricted); § 23.93 (land restricted to airport

use by public appraised at market value as restricted).

2. *See* Tex. Const. art. VIII, § 1–2, 1–d(a); Tax Code § 23.41 (land designated for agricultural use appraised according to agricultural capacity not to exceed market value); § 23.52 (agricultural land appraised by capitalization of income not to exceed market value); § 23.73 (timber land appraised by capitalization of income not to exceed market value).

value" quite differently: "The market value ... *is* the price for which it would sell as a unit to a purchaser *who would continue the business.*" Tax Code § 23.12(a) (emphasis added).[3] This is not an appraisal *method.* It doesn't even purport to be. It purports to be a *definition* of market value ("The market value *is* ...") that is different from the definition of market value in section 1.04(7) of the Tax Code. And the new definition is conspicuously unconstitutional because it nakedly forbids an appraiser to consider any applicable market factor save a single, inflexible factor—the selling price to "a purchaser who would continue the" seller's business. *See, e.g., State v. Federal·Land Bank of Houston,* 160 Tex. 282, 329 S.W.2d 847, 848–49 (1959) (mineral estates may not be valued at different amounts based solely on whether they have been severed from surface rights); *Whelan,* 282 S.W.2d at 380 (non-producing oil and gas leases may not be assessed at a flat rate of one dollar per acre irrespective of actual market value); *Ogburn v. Ward County Irr. Dist. No. 1,* 280 S.W. 169, 171 (Tex. Comm'n App.1928, judgm't adopted) (real property may not be classified by zones and market value of properties determined by zone in which properties lie, and use to which properties are put, without reference to improvements affecting actual market value); *Rowland v. City of Tyler,* 5 S.W.2d 756, 760 (Tex. Comm'n App.1928, holding approved) (rent receipts may not be made controlling and decisive factor in determining market value); *Hawthorne v. Hillin,* 463 S.W.2d 266, 267 (Tex.Civ.App.—Waco 1971, no writ) (properties may not be classified as adjoining or not a black-top road, and valued based on whether residence abuts such road, irrespective of other factors); *Richardson v. State,* 53 S.W.2d 508, 510 (Tex.Civ.App.—Eastland 1932), *aff'd, State v. Richardson,* 126 Tex. 11, 84 S.W.2d 1076 (Comm'n App.1935) (market value of royalty interests may not be determined exclusively on a single factor of production for specified period without reference to other factors affecting market value). *See also,* William E. York, *Equality in Taxation,* 10 Houst. L.Rev. 656, 668–89 (1973) (use of one inflexible method to determine value for assessment·purposes directly violates equal and uniform provision of state constitution); Jay D. Howell, Jr., 21 *Texas Practice, Property Taxes* § 416 (1988) (arbitrary and unconstitutional valuation results from basing value judgment on one or few factors rather than all applicable factors).

The result is this: Insofar as Tax Code section 23.12(a) applies to real property, it is unconstitutional on two grounds. Firstly, it violates article VIII, section 1(b), of the constitution requiring taxation of real property in proportion to its actual market value. Tax Code section 23.12(a) declares that "[t]hat the market value of" the described real property "*is* the price for which it would sell ... to a purchaser who would continue the business." This exclusion of all market factors save one prohibits an appraisal of actual or true market value. Secondly, section 23.12(a) violates article VIII, section 1(a) of the constitution requiring that taxation be equal and uniform. Tax Code section 23.12(a) restricts an appraisal of the real property described therein to the single market factor just mentioned while Tax Code section 1.04(7) requires that all other taxable real property[4] in the state be appraised based upon *all* factors operating at the time in an open market. Because the taxation of real property depends upon its appraised value, Tax Code section 23.12(a) produces an unequal taxation of real property under the numerous authorities cited above.

---

3. The inclusion of the real property as "inventory" in Tax Code section 23.12(a) results from a 1987 amendment of the section, which had previously applied only to personal property held as "inventory." If it be argued that section 23.12(a) *does* in some circumstances allow for the valuation of the described real property at actual market value, then the amendment was unnecessary, purposeless, and meaningless because Tax Code section 1.04(7) has dictated appraisals at actual market value since 1978. I suggest that the transparent purpose of the 1987 amendment was to require appraisal of the described real property at something *other than* actual market value and that the words of the amendment were meant to be construed accordingly and in their literal meaning.

4. Excepting, of course, the kinds of real property for which the Tax Code makes provisions for a different measure of appraisal under express authority given by constitutional amendment. *See* note 2, *supra.*

The opinion in *Enron Corp. v. Spring Independent School District*, 922 S.W.2d 931 (Tex.1996) is not useful here. The statute involved in that decision did not purport to define the market value of real property, for tax purposes, in a manner different from the actual market value contemplated in the constitution or the market value defined in Tax Code section 1.04(7). The statute considered in *Enron* merely gave the taxpayer an election as to the date upon which the market value of his or her property might be made.

For the reasons given, I would hold Tax Code section 23.12(a) unconstitutional as applied to real property.