CITY OF SAGINAW et al., Appellants,

v.

GARVEY ELEVATORS, INC., et al., Appellees.

No. 16943.

Court of Civil Appeals of Texas.

Fort Worth.

July 19, 1968.

Rehearing Denied Sept. 13, 1968.

Davis, Callaway & Marshall, and Clyde M. Marshall, Jr., Fort Worth, for appellants.

Elvin E. Tackett, Euless, for appellees.

## OPINION

MASSEY, Chief Justice.

The question is whether the City of Saginaw assessed and demanded the proper amount of 1966 taxes from Garvey Elevators, a corporation.

Being dissatisfied with the assessment of ad valorem taxes upon its grain elevators, Garvey filed suit to have enjoined any attempted collection of *ad valorem* taxes in excess of $10,898.08, which sum Garvey paid into the registry of the court on filing suit (as its tender in equity). The amount of taxes assessed for 1966 on the subject property was $20,009.75. By order of the trial court, upon agreement of the parties, the $10,898.08 was delivered over to the City of Saginaw (to apply on Garvey's taxes) without prejudice to the parties.

Following a trial before the court without a jury a judgment was rendered as follows: "IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Defendants, City of Saginaw, a municipal corporation and H. B. Wofford, Tax Assessor and Collector of the City of Saginaw, be, and they are each hereby enjoined and restrained from assessing or collecting or attempting to assess or collect any ad valorem taxes for the year 1966 against the property of Plaintiffs located in the City of Saginaw, based on such above mentioned valuation and assessment, in excess of the $10,898.00 heretofore deposited into the register of the Court, without prejudice to the rights of all parties on subsequent re-assessment." From the judgment the City and its Tax Assessor appealed.

Affirmed.

The City suggests that there is no material difference in the instant case from that in the case of Garvey Elevators v. Eagle Mountain-Saginaw I. S. D., 423 S.W.2d 455 (Fort Worth Tex.Civ.App.1968, no writ hist.). We disagree. The material difference lies in Garvey having made an issue of fact for determination in the instant case and having obtained favorable findings both upon the fact and law by the trial court.

In Eagle Mountain the taxpayer was Garvey, the year was 1966, and the property taxed was the same property the City of Saginaw seeks to tax. In both cases dispute was over the amount which would represent the true and actual market value of the subject property—and because of the failure of Boards of Equalization to take into consideration the diminishment in the use of Garvey's elevators for grain storage purposes with the effect upon and reduction of the market value thereof. However, in the instant case the matter was presented to the Board while in Eagle Mountain it was not presented to the School District's Board and Garvey's initial complaint was subsequent to that Board's action.

The subject property consists of very large elevator facilities suitable for grain storage in large quantities. It was designed and constructed to take advantage

of a policy of the Federal Government, now abandoned and a contradictory policy adopted. It was one of the 12 or 15 very large grain-storage facilities in the United States. For several years (under provision of the former policy) the primary customer of these elevator facilities was the Commodity Credit Corporation, a division of the United States Department of Agriculture. The storage elevators were ideal for purposes of this customer so long as private grain-storage elevators were desired for storage of surplus government grain. To accumulate and store such was formerly the policy of the government.

At the time the property was constructed and for several years thereafter application of such policy proved most profitable for Garvey. The gross income from its City of Saginaw operations in 1961 was $3,889,498.00. In recent years there was an announced change in the pertinent policy of the Federal Government, to-wit: To withdraw and diminish the amount of grain acquired and to be stored in private grain-storage elevators, and support the program of the "soil bank" rather than encourage grain production, purchase grain, and store it at government expense as under the former policy.

One result of the operation of the new policy was a diminishment in the earnings of Garvey so that the gross income from the operation of the elevators by 1967 was only $96,929.00. Its elevators, once full or nearly full, have gradually become storage facilities which remain almost empty.

An analogous situation would be that of an automobile service-station, located upon what was formerly a principal highway and readily accessible to motorists traveling in both directions,—but presently on what became a frontage road as the result of new "limited access—super-highway" construction. Effect upon grain-storage facilities because of the government's change in policy for handling grain would be like unto the effect upon such an automobile service-station because of the gov-

ernment's change in policy for handling highway traffic. In both situations there would very likely be a decided reduction in the properties' market values. Of course the validity of any finding to that effect would depend upon the evidence in each individual case where the question might become important for purposes of market value ascertainment as an incident to taxation procedures.

In Eagle Mountain the reduced use of Garvey's properties due to the change in policy by the government—and advisability of giving consideration thereto as a factor and essential element in arriving at a proper valuation for purposes of the taxation procedure for the school district—was never brought to the attention of the Board of Equalization. That quasi-judicial body was ignorant of the policy change or of the effect of such change upon the market value of the Garvey elevators. In the instant case it was not only brought to the attention of the Board of Equalization, but Garvey made strong protest relative to the City's proposed amounts for valuation and taxation on the ground that there had been a material reduction in value because of the foregoing—with evidence tendered in support of the protest.

In Eagle Mountain we held that since the contention and evidence in support thereof was never presented to the Board of Equalization we could not hold that the procedure pursuant to which that Board decided the amount of taxes proper to be collected could be termed arbitrary and capricious; nor that the failure of the Board to take into consideration the element of reduction in market value due to governmental policy change (of which element it was unaware) necessarily resulted in an arbitrary and improper valuation. That being so, and in view of the fact that the method of valuation adopted by the Board could not be said to have been fundamentally erroneous, we sustained summary judgment in favor of the School District. We concluded that no more than an "error of judgment" on the part of the Board of Equaliza-

tion could be said to appear; that to merely demonstrate such would not suffice as a basis for avoiding the Board's action.

■ In the instant case it was found by the trial court (upon evidence we hold sufficient—and which findings we have concluded were not contrary to the greater weight and preponderance of the whole evidence) that despite Garvey's evidence and contention the Board considered and used the cost to purchase the land and construct improvements as the market value figure for purposes of fixing 1966 *ad valorem* taxes to be assessed thereon and *nothing more;* and refused to consider the discontinued or diminished use of the subject elevator facility for storage or to consider the announced Federal Government policy of diminishing storage of its grain in private elevators as having any effect upon the market value of the property.

The trial court concluded from the evidence presented upon the hearing before it that in determining the value of the Garvey elevators a fundamentally erroneous principle or method of determining such had been applied by the Board; that the determination of value was arbitrary; and that assessment of taxes based upon such erroneously determined and grossly excessive valuation would result in Garvey's substantial injury unless enjoined.

It is not to be doubted but that in this, as in other cases, the Board of Equalization was earnestly attempting to determine the true and actual cash market value of the subject property and to use such value as the basis for assessment and computation of a proper tax to be levied. The trial court took occasion to note that such was the objective of the Board. It is well known that it is impracticable in the procedure undertaken by taxing authorities and Boards of Equalization for direct value evidence to be sought and secured as to each item of property to be taxed. What is practical to be done, and what is usually done, is to settle upon a standard or

"yardstick" of measure for different classes of property, application of which to the different items of property within the class will usually result in correct value. An example would be in instances of residential construction. Oftentimes the number of square feet in the floor of the structure, is used as a multiple for determining value of this character of improvements on a lot. The class of property is determined (such as whether frame construction or otherwise; whether composition or wood shingles; etc.) to be taken into consideration with age and size. A house between 15 and 20 years old, of brick-veneer construction, with composition shingles, etc., would fall within a certain classification wherein ordinarily a proper market value would be equivalent to "X-dollars" multiplied by the number of square feet. Except in cases of evidence demonstrating the contrary to be true the tax authorities can settle a large number of cases in a relatively brief period by use of such a method.

■ It is often a fallacy, however, for a Board of Equalization to take the position that this character of computation has resulted in a correct evaluation for tax purposes. That was the case here. The market value of grain-storage elevators might in former times have been practical to evaluate by multiplying the "classification valuation" by the number of bushels of grain-storage capacity. Basically that was the method used in the evaluation of the subject property. But when it is shown to the Board that application of the formula is not reliable, and that as applied to a particular item of property the formula would result in a "grossly excessive" value in proportion to the amount for which the item could actually be bought or sold, the Board can only be safe by resorting to the standard prescribed in Vernon's Ann.Tex. St., Art. 7174, "Valuation of property for taxation". This statute prescribes that the value of the property to be taxed is to be determined by what it can be bought and sold for.

■ Market value, as determinable through application of the "willing buyer-seller test" cannot be ignored. Any method used to determine market value which produces a substantially different figure as such value is fundamentally wrong and the purported value thereby ascertained fundamentally erroneous under the Constitution and Statutes of Texas. To attribute validity thereto would be to ignore market value. If the figure is "grossly excessive" of the figure resultant from application of the "willing buyer-seller test" the attempt to impose a tax based thereupon is remedial.

The trial court concluded that the value at which the Board arrived was thus fundamentally erroneous. To do so was its province as fact-finder as well as the law-court. Its findings and conclusions upon fact and law were supported by evidence and were not contrary to the greater weight and preponderance of all the evidence. In view thereof the grant of injunctive relief was undoubtedly proper. Of the cases cited to us as authoritative we have found the most aid in State v. Whittenburg, 153 Tex. 205, 265 S.W.2d 569 (1954).

By reason of the City's request for additional fact findings the trial court found that there were grain storage facilities in the City of Saginaw other than and in addition to those of Garvey, and that there was no proof as to the basis for valuation thereof for tax purposes and no showing of the plan used to tax them for 1966—though it was demonstrated in the evidence that none had complained; and that there was no proof that Garvey's assessed values were unfair or discriminatory with respect to tax values assessed against other classes of real property in the City of Saginaw in 1966.

Obvious in the City's request for the fact findings was the desire to suggest that though error might exist in the valuation of Garvey's property for tax purposes a resultant discriminatory tax amount did not necessarily result. In other words the proposition is presented that if all other properties like unto that of Garvey were similarly erroneously evaluated each tax amount would all be in proportion to the tax on all other like properties similarly situated.

The trial court's conclusion of law was that under the "wrongfully determined value" Garvey is not and will not be taxed in proportion to value (of its properties) as that term is defined in the Constitution, Statutes, and case law of Texas.

■ It was no part of Garvey's burden to prove more than that the valuation of its property was erroneous and grossly excessive in comparison with its true value as result of arbitrary and capricious action of the Board of Equalization. Its case was made and right to injunctive relief established when such proof was made.

There are several points of error which do not fall within the foregoing discussion. We do not write upon them since we believe that so to do would not be of value nor aid the body of jurisprudence. In any event they have been severally considered and are overruled.

Judgment is affirmed.