TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-96-00043-CV






Travis Central Appraisal District, Appellant



v.



FM Properties Operating Company, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT


NO. 93-11165, HONORABLE PAUL R. DAVIS, JUDGE PRESIDING 






 FM Properties Operating Company ("FM"), appellee, sued the Travis Central Appraisal
District ("the District"), appellant, challenging an order of the District's Appraisal Review Board that
appraised, for ad valorem taxation purposes, the value of real estate owned by FM. Relying on section
23.12(a) of the Texas Tax Code, which requires that real estate inventory be valued as a unit, FM claimed
the District's assessment based on individual lot values was excessive. See Tex. Tax Code Ann. §
23.12(a) (West Supp. 1997) (hereinafter "Code"). The District answered by (1) challenging the trial
court's jurisdiction to entertain the suit because FM had not paid the disputed taxes before filing suit, as
required by section 42.08 of the Code; and (2) counterclaiming for a declaratory judgment that section
23.12(a) is unconstitutional. FM responded by seeking a declaratory judgment that section 42.08 is
unconstitutional. After a trial to the court, the trial court rendered judgment for FM, ruling that section
23.12(a) is constitutional and that section 42.08 is unconstitutional. The District perfected this appeal. We
will affirm.

FACTUAL BACKGROUND

 FM is in the business of purchasing raw land or developed lots to sell to builders, who then
build homes on the land as part of the development of a subdivision. On January 1, 1993, FM owned a
total of 210 residential lots in four subdivisions; on January 1, 1994, FM owned a total of 153 residential
lots in three subdivisions. All of the lots were held by FM for sale in the ordinary course of its business,
had not been occupied, leased, or rented, and produced no income during FM's ownership. The parties
stipulated that (1) if section 23.12(a) of the Code is constitutional, an appraisal of FM's properties as a unit
pursuant to that statute would yield market values of $9,933,326 for the tax year 1993 and $6,670,193
for the tax year 1994; and (2) if section 23.12(a) is unconstitutional, the sum of the individual lot values of
FM's parcels would yield total market values of $13,932,875 for the tax year 1993 and $10,755,881 for
the tax year 1994.


DISCUSSION

 In point of error two, the District contends the trial court erred in declaring unconstitutional
section 42.08 of the Code, which requires that a taxpayer pay the previous year's real property assessment
as a condition for obtaining judicial review. The Texas Supreme Court's recent decision in Central
Appraisal District v. Lall, 924 S.W.2d 686 (Tex. 1996), holding section 42.08 unconstitutional, is
dispositive on this issue. We overrule point of error two.

 In point of error one, the District asserts that section 23.12(a) violates the Texas
Constitution. The relevant portion of section 23.12(a) provides:


[T]he market value of an inventory is the price for which it would sell as a unit to a
purchaser who would continue the business. An inventory shall include residential real
property which has never been occupied as a residence and is held for sale in the ordinary
course of a trade or business, provided that the residential real property remains
unoccupied, is not leased or rented, and produces no income.



Code § 23.12(a). (1) The District contends section 23.12(a) violates article VIII, sections 1 and 2 of the
Texas Constitution, which provide:


§ 1. Equality and uniformity; tax in proportion to value; income tax; exemption of
certain tangible personal property from ad valorem taxation


Sec. 1. (a) Taxation shall be equal and uniform.


 (b) All real property and tangible personal property in this State, unless exempt as
required or permitted by this Constitution, whether owned by natural persons or
corporations, other than municipal, shall be taxed in proportion to its value, which shall be
ascertained as may be provided by law.


* * *


§ 2. Occupation taxes; equality and uniformity; exemptions from taxation


Sec. 2. (a) . . . [T]he legislature may, by general laws, exempt from taxation [various types
of property specifically described in this section]; and all laws exempting property from
taxation other than the property mentioned in this Section shall be null and void.


Tex. Const. art. VIII, §§ 1, 2. The District asserts that section 23.12(a) violates the "equal and uniform"
and "in proportion to its value" requirements contained in section 1 and constitutes an unauthorized
exemption from taxation under section 2.

 In two recent opinions, the Texas Supreme Court summarized the rules for determining the
constitutionality of a taxation statute:


 In determining the constitutionality of a statute, we begin with a presumption that
it is constitutional. Courts presume that the Legislature "understands and correctly
appreciates the needs of its own people, that its laws are directed to problems made
manifest by experience, and that its discriminations are based upon adequate grounds."
The wisdom or expediency of a law is for the Legislature to determine, not this court. 
Furthermore, the party challenging the constitutionality of a statute bears the burden of
demonstrating that the enactment fails to meet constitutional requirements.



Enron Corp. v. Spring Indep. Sch. Dist., 922 S.W.2d 931, 934 (Tex. 1996) (citations omitted) (quoting
Smith v. Davis, 426 S.W.2d 827, 831 (Tex. 1968)).


 We presume that a statute passed by the Legislature is constitutional. 
Furthermore, this Court must liberally construe any constitutional provision that directs the
Legislature to act for a particular purpose, and we must, if possible, construe statutes to
avoid constitutional infirmities. Finally, we must reject interpretations of a statute that
defeat the purpose of the legislation so long as another reasonable interpretation exists.



Nootsie, Ltd. v. Williamson County Appraisal Dist., 925 S.W.2d 659, 662 (Tex. 1996) (citations
omitted).

 In Enron, the supreme court addressed an identical constitutional challenge to a taxation
statute that is closely related to the one at issue here. Section 23.12(f) of the Code permits "[t]he owner
of an inventory" to elect to have its inventory "appraised at its market value as of September 1 of the year
preceding the tax year to which the appraisal applies" instead of January 1 of the tax year, the date when
all other property must be appraised for ad valorem tax purposes. In upholding the constitutionality of the
statute, the court held that "the Legislature may constitutionally draw distinctions in the manner in which
market value of property is determined for ad valorem tax purposes, as long as the classifications are not
unreasonable, arbitrary, or capricious." 922 S.W.2d at 936. In the present case, therefore, the touchstone
for the District's constitutional challenge is whether section 23.12(a) creates a valuation method for
inventory that is unreasonable, arbitrary, or capricious.

 For ad valorem tax purposes, "value" must be based on "reasonable market value." 
Nootsie, 925 S.W.2d at 661; Enron, 922 S.W.2d at 935. The Code defines "market value" as:


the price at which a property would transfer for cash or its equivalent under prevailing
market conditions if:


(A) exposed for sale in the open market with a reasonable time for the seller to find a
purchaser;


(B) both the seller and the purchaser know of all the uses and purposes to which the
property is adapted and for which it is capable of being used and of the enforceable
restrictions on its use; and


(C) both the seller and purchaser seek to maximize their gains and neither is in a
position to take advantage of the exigencies of the other.


Code § 1.04(7) (West 1992). This statutory definition, first enacted in 1979, accords with the traditional
definition applied by Texas courts that market value means the price property would bring when offered
for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of
buying it. See State v. Windham, 837 S.W.2d 73, 77 (Tex. 1992); Polk County v. Tenneco, Inc., 554
S.W.2d 918, 921 (Tex. 1977); City of Pearland v. Alexander, 483 S.W.2d 244, 247 (Tex. 1972);
Humes v. Hallmark, 895 S.W.2d 475, 480 (Tex. App.--Austin 1995, no writ). See generally Gary A.
Goff, Comment, Fair Market Value: A Primer for Texas Legal Practice, 15 Tex. Tech L. Rev. 637,
639-43 (1984).

 The Code also provides:


 The market value of property shall be determined by the application of generally
accepted appraisal techniques, and the same or similar appraisal techniques shall be used
in appraising the same or similar kinds of property. However, each property shall be
appraised based upon the individual characteristics that affect the property's market value.


Code § 23.01(b) (West 1992).

 The District complains that section 23.12(a): (1) violates the "equal and uniform"
requirement of article VIII, § 1(a) of the constitution by treating some owners of real property (those whose
property comes within the statutory description of "inventory") differently from other owners of real
property; (2) violates the "in proportion to its value" requirement of article VIII, § 1(b) by imposing a
valuation methodology that does not yield market value; and (3) violates the exemption provision of article
VIII, § 2(a) by exempting from taxation certain real property that is not mentioned in that section. We will
address the District's arguments in that order.


I. Equal and Uniform

 The District's primary complaint about section 23.12(a) is that it discriminates against the
owners of real estate whose property does not satisfy the prerequisites of "inventory" set out in the statute. 
The District argues that, by treating owners of real estate inventory differently from owners of other real
property, the statute violates the constitutional requirement that taxation be "equal and uniform." On
essentially the same basis, the District argues that section 23.12(a) is arbitrary and capricious.

 To the extent the District is arguing that section 23.12(a) is per se unconstitutional merely
by virtue of creating a classification scheme wherein owners of real estate inventory are treated differently
from owners of other real property, this argument has been foreclosed by Enron. The foundational holding
of Enron was that "the Legislature has the authority to establish a method of determining the market value
of inventory that differs from the method of valuing other property for ad valorem tax purposes . . . ." 922
S.W.2d at 941. As to the present complaint, therefore, the District can prevail only by showing that the
particular method of determining the market value of inventory mandated by section 23.12(a) is
unreasonable, arbitrary, or capricious. Accordingly, the features of that method must be examined.

 The first sentence of section 23.12(a) requires that the market value of any inventory
--whether real or personal property--be determined by the price for which the property would sell "as
a unit to a purchaser who would continue the business," i.e., the business of selling whatever goods make
up the inventory. The term "inventory" is not defined in the Code, but it is clear from the context that the
legislature meant the stock of goods on hand being held for sale in the regular course of a business. Cf.
Tex. Bus. & Com. Code Ann. § 9.109 (West 1991). The second sentence of section 23.12(a) establishes
the prerequisites for including real property in the category of "inventory": (1) residential real property that
(2) has never been occupied as a residence, (3) is held for sale in the ordinary course of a trade or
business, (4) remains unoccupied, (5) is not leased or rented, and (6) produces no income. To the extent
the first sentence of section 23.12(a) relates to personal property, the District makes no complaint. 
Indeed, the District concedes that "it may be reasonable to classify personalty held in inventory as
'inventory' and allow bulk appraisal of such property for tax purposes." Nor does the District complain
about the criteria in the second sentence by which it is determined whether specific real property constitutes
inventory. Rather, the District argues generally that a separate classification for inventory, whereby
inventory is appraised as a unit, cannot be applied to real property at all. The District asserts that the
market value of the whole property can be determined only by finding the market value of each individual
lot and then adding those values together. We reject the District's argument.

 The "unit" method of valuation imposed by section 23.12(a) is supported by generally
accepted appraisal techniques that have been approved by numerous courts and commentators. 
Professional appraisers typically value multiple unimproved lots in a subdivision--or potential
subdivision--as a unit, utilizing the so-called "development approach." (2) See J. D. Eaton, Real Estate
Valuation in Litigation 201-25 (Amer. Inst. Of Real Estate Appraisers 1982); Stephen Leroy Angell,
Appraisal of Subdivisions, in Encyclopedia of Real Estate Appraising 483-509 (Edith J. Friedman ed.
1959); see also The Appraisal of Real Estate 49-50 (Amer. Inst. of Real Estate Appraisers, 8th ed.
1983); Real Estate Appraisal Terminology 11-12 (Amer. Inst. of Real Estate Appraisers & Soc'y of
Real Estate Appraisers, Byrl N. Boyce ed. 1975) (defining "anticipated use method"). In applying the
development approach to raw land that is not yet fully subdivided, the procedural steps generally used by
appraisers are as follows:


1. Prepare subdivision layout to determine number, size, and shape of typical lots.

2. Estimate retail value of lots.

3. Estimate direct development costs.

4. Estimate indirect development costs.

5. Compute income residual to developer's profit and land (Step 2 minus Steps 3 and 4).

6. Deduct developer's profits from Step 5.

7. Estimate the amount of time required to develop and sell out the subdivision.

8. Discount anticipated income stream into a current indicated raw land value.


Eaton, supra, at 223. Although the development approach is often utilized to determine market value for
raw land that is not yet subdivided, as for example where it is shown that residential subdivision is a tract's
highest and best use, it is even better suited for a tract of land that is already fully subdivided, because the
existence of an actual subdivision layout makes step 1 unnecessary and makes the figures obtained from
steps 2, 3, 4, and 7 more reliable.

[For land that has been fully subdivided,] [t]he problems involved in the partially developed
subdivision have evaporated. The costs to the developer are no longer speculative, the
value of the individual lots in the market may be ascertained with as much certainty as in
any other condemnation proceeding, and the possibility of such a use is no longer remote.


Eaton, supra, at 212 (quoting 4 Nichols on Eminent Domain, § 12.3142[1][d] (rev. 3d ed. 1979, Julius
L. Sackman, co-author)).

 For purposes of the present case, the significance of the development approach is that it
acknowledges the propriety of valuing a subdivided tract as a unit, so that the retail price at which individual
lots will be sold is only one of several factors to be considered. Professional appraisers recognize that,
although the retail price of individual lots should be considered, direct and indirect development and
marketing costs must also be considered in order to find true market value:


 Another terminology problem involves use of the terms retail value and gross
sellout value. These terms do not identify value estimates; they represent the total gross
receipts expected to be produced by the project. Value is a point-in-time estimate, based
in part on the theory that the value of any good or service is the present value of the future
benefits to be derived from its ownership. Since arriving at a gross sellout value does not
involve consideration of the expenses of disposition or holding or the calculation of present
worth, gross sellout value is not a value estimate. Labeling expected gross receipts as any
kind of value estimate is highly misleading and should be avoided.


Douglas D. Lovell and Robert S. Martin, Subdivision Analysis 61 (Appraisal Inst. 1993). A paramount
concept to be gleaned from this passage is that value is a point-in-time estimate. The notion of market
value, therefore, necessarily refers to what a purchaser would pay for property at the present time in a
single transaction, not what might be paid by dozens or even hundreds of purchasers if the property were
sold in pieces over an extended period of time.

 Courts and commentators have also recognized and approved the development approach
for appraising the value of a tract of land that has been--or is expected to be--subdivided into smaller
parcels. Questions of valuation of land often arise in eminent domain cases, in which the respective
positions of the landowner and the government are opposite from tax cases. In eminent domain cases, the
landowner rather than the taxing authority attempts to show the highest value possible. In such cases,
courts permit the landowner to present evidence of individual lot values only in conjunction with evidence
of development and marketing costs:


[T]he better view . . . is that a lot method appraisal can be admitted in appropriate cases
if the proponent offers credible evidence of the costs of subdivision--e.g., the expense of
clearing and improving the land, surveying and dividing it into lots, advertising and selling,
holding it, and paying taxes and interest until all lots are sold.


United States v. 47.3096 Acres, Etc., in Oxford Township, 583 F.2d 270, 272 (6th Cir. 1978); see
also United States v. 99.66 Acres of Land, 970 F.2d 651, 655 (9th Cir. 1992); United States v. 100
Acres of Land, More or Less, in Marin County, 468 F.2d 1261, 1266-67 (9th Cir. 1972); United
States v. 147.47 Acres of Land in Monroe County, 352 F.Supp. 1055, 1060-61 (M. D. Penn. 1972); 
Dash v. State, 491 P.2d 1069, 1071-75 (Alaska 1971); Commonwealth v. McCready, 371 S.W.2d
485, 487 (Ky. Ct. App. 1963); Clifford v. Algonquin Gas Transmission Co., 604 N.E.2d 697, 702-03
(Mass. 1992); Ramsey County v. Miller, 316 N.W.2d 917, 919-21 (Minn. 1982); Robinson v. Town
of Westport, 610 A.2d 611, 616 (Conn. 1992). (3) At least one noted commentator has expressly approved
the development approach: "In the case of land that has actually been fully subdivided, or nearly so, the
courts are in agreement that the 'lot method' or 'developer's residual approach' to valuation is proper." 
4 Nichols on Eminent Domain, § 12B.14[1][d], at 12B-180 (rev. 3d ed. 1997, Julius L. Sackman, co-author). In the present case, FM's appraisal expert testified that the development approach is a generally
accepted appraisal technique and that he used that approach in appraising the value of the property at issue
here.

 Texas courts have recognized three general approaches to determining market value: (1)
the market data (or comparable sales) approach; (2) the cost approach; and (3) the income (or income-capitalization) approach. See Religious of the Sacred Heart v. City of Houston, 836 S.W.2d 606, 615-16 (Tex. 1992); Polk County v. Tenneco, Inc., 554 S.W.2d 918, 921 (Tex. 1977). In addition, when
circumstances dictate, the Texas Supreme Court has not hesitated to recognize alternative methods of
valuation. See Missouri-Kansas-Texas R.R. v. City of Dallas, 623 S.W.2d 296, 299-301 (Tex. 1981). 
These approaches are not different definitions of market value; they are simply different ways of arriving
at an estimate of what a willing buyer would pay a willing seller.

 The development approach can be viewed as merely a variation of the income approach
to valuation. (4) The supreme court has stated that the income approach to valuation "proceeds on the
premise that a buyer of income-producing property is primarily interested in the income which his property
will generate." Polk County, 554 S.W.2d at 921. See generally Goff, supra, 15 Tex. Tech L. Rev. at
648-52. Since inventory is, by definition, the goods on hand being sold in the regular course of a business,
any purchaser of a business's entire inventory will naturally be interested primarily in the income that the
later retail sale of the inventory will generate. (5) Thus, the legislature could reasonably have decided to
require use of a variation of the income approach for valuing inventory. Cf. City of Houston v. West, 514
S.W.2d 299, 304-05 (Tex. Civ. App.--Houston [1st Dist.] 1974), rev'd on other grounds, 520 S.W.2d
752 (Tex. 1975) (income approach is appropriate for determining market value of raw land where data
regarding potential income production is more readily available than sales data). Valuing real estate
inventory as a unit is not necessarily the only way to determine its market value. But the example of the
development approach shows that valuing such property as a unit is one fair and reasonable way of making
that determination, thus placing the choice of valuation methods squarely in the hands of the legislature.

 Nonetheless, the District, citing Richey v. Moor, 249 S.W. 172 (Tex. 1923), argues that
Texas law unswervingly requires separate valuation and assessment of separate pieces of real property. 
The District overstates its case. In Richey, the taxpayer affirmatively sought to pay taxes separately on
each of seven tracts in order that any lien resulting from unpaid taxes on an eighth tract would not attach
to the other seven. Id. at 172-73. That a taxpayer might be entitled to pay taxes separately on different
tracts, however, does not mean he is required to do so. The Texas Supreme Court has held that
"assessment by separate tracts is for the tax payer's benefit." French Indep. Sch. Dist. v. Howth, 134
S.W.2d 1036, 1038 (Tex. 1940); see also State Mtg. Corp. v. Ludwig, 48 S.W.2d 950, 953-54 (Tex.
1932). This appears to be the rule in other jurisdictions as well. See M. C. Dransfield, Annotation,
Different Parts of Parcels of Land in Same Ownership as Single Unit or Separate Units for Tax
Assessment Purposes, 133 A.L.R. 524, 525 (1941). If a taxpayer has, for his own benefit, the "right"
to separate assessment of his several properties, it would seem to follow that he also has the concomitant
right to waive that benefit and to treat his own multiple lots or parcels as one unit for tax purposes.

 Indeed, it appears that in some circumstances Texas law may actually prohibit landowners
from valuing and assessing multiple tracts of land separately:


[A]lthough the general rule is that the taxpayer is entitled to have each separate tract or
parcel of land separately valued, and assessed for taxes, and the tax lien separately fixed
upon each so that one tract may not be charged or sold to satisfy the taxes upon another
or other tracts (Richey v. Moor, 112 Tex. 493, 249 S.W. 172), yet it is now equally well
settled that where two or more tracts or parcels are occupied and used together by the
property owner for a single purpose, such as a homestead, their separate identities become
merged into one by such use, and they may be valued and assessed in solido, and the tax
lien may be fixed and foreclosed upon all as one parcel.


City of Edinburg v. Magee, 97 S.W.2d 983, 984 (Tex. Civ. App.--San Antonio 1936, no writ); see also
Manges v. Freer Indep. Sch. Dist., 653 S.W.2d 553, 566 (Tex. App.--San Antonio 1983), rev'd on
other grounds, 677 S.W.2d 488 (Tex. 1984); Duval County Ranch Co. v. State, 587 S.W.2d 436,
444-45 (Tex. Civ. App.--San Antonio 1979, writ ref'd n.r.e.), cert. denied, 449 U.S. 1077 (1981);
Moody-Seagraves Co. v. City of Galveston, 43 S.W.2d 967, 970 (Tex. Civ. App.--Galveston 1931,
writ ref'd); cf. Electra Indep. Sch. Dist. v. W. T. Waggoner Estate, 168 S.W.2d 645, 650 (Tex. 1943). 
We see no reason why the legislature would not be authorized to conclude that lots held as real estate
inventory are owned and used "for a single purpose."

 Finally, the legislature may have concluded that valuing the inventory of a business as a unit
is inherently fairer and more likely to produce true market value than other approaches such as multiplying
the total number of inventory items on hand by the retail price of each individual item. For example, imagine
a company that is in the business of selling widgets. The company has on hand a stock of 100,000 widgets,
which retail for $2 each. Thus, the company hopes to receive $200,000 in gross receipts from the sale
of its widgets. Assume the evidence shows, however, that in all likelihood it will take one year to sell off
this entire stock of widgets; during that year, the company will likely spend $25,000 to lease a widget store,
$25,000 to staff the store with salespersons, $25,000 to advertise the widgets, and $25,000 to maintain
the widgets in good condition while they are waiting to be sold. Thus, the company hopes, by the end of
the year, to net $100,000 profit from its widget sales (less the original cost to buy the stock of widgets). 
What would a reasonable, willing buyer with full information pay for the entire inventory of widgets at the
beginning of the year? No more than $100,000, possibly less. Yet the simplistic method of multiplying the
number of widgets on hand (100,000) by the retail sales price of each ($2) would produce a "fair market
value" of $200,000, even though no "willing buyer" would pay that much for the company's inventory as
a unit.

 Conceptually, the valuation of real estate inventory is identical to the valuation of personal
property inventory. Accordingly, the foregoing widget hypothetical can easily be applied to real estate
inventory. Imagine a real estate developer who has on hand 100 lots that have been subdivided but are
unimproved. The developer plans to sell each lot for $10,000, producing gross receipts of $1,000,000. 
Assume the evidence shows that it is predicted to take approximately two years to sell off all 100 lots;
during those two years, he will spend an estimated $100,000 on a sales office, $150,000 on a sales staff,
$200,000 on advertising, and $50,000 to maintain the property. Thus, by the end of the two years he
hopes to net $500,000 from the sale of the lots (less the original cost the developer paid the purchase the
lots). What would a reasonable willing buyer pay for those 100 lots at the present time? No more than
$500,000, possibly less. Yet, once again, the simplistic method of multiplying the number of lots on hand
(100) by the retail sales price of each ($10,000) would produce a "fair market value" of $1,000,000, even
though no willing buyer would pay that much for them.

 An amount that no willing buyer would pay for property is simply not market value:


 Market value, as determinable through application of the "willing buyer-seller test"
cannot be ignored. Any method used to determine market value which produces a
substantially different figure as such value is fundamentally wrong and the purported value
thereby ascertained fundamentally erroneous under the Constitution and Statutes of Texas. 
To attribute validity thereto would be to ignore market value.


City of Saginaw v. Garvey Elevators, Inc., 431 S.W.2d 575, 579 (Tex. Civ. App.--Fort Worth 1968,
writ ref'd n.r.e.). In the present case, common sense alone dictates that applying the District's "number
of lots times retail price of each lot" formula produces a figure grossly in excess of what a willing buyer
would pay for FM's entire inventory of lots at a given point in time. Thus, the District's proposed method
for determining the market value of FM's property is itself arguably unreasonable.

 Based on the foregoing discussion, we hold that the inventory classification created by
section 23.12(a) of the Tax Code is not unreasonable, arbitrary, or capricious and does not, therefore,
violate the "equal and uniform" provision contained in article VIII, section 1(a) of the Texas Constitution.


II. In Proportion to its Value

 The District also complains that section 23.12(a) violates the constitutional requirement that
property be taxed "in proportion to its value." Tex. Const. art. VIII, § 1(b). This requirement simply
means that all assessed valuations must be "based upon reasonable cash market value." Parker County
v. Spindletop Oil & Gas Co., 628 S.W.2d 765, 767 (Tex. 1982). The test for determining if a tax statute
complies with this constitutional requirement appears to be substantially similar to the "unreasonable,
arbitrary, or capricious" standard discussed above. See Enron, 922 S.W.2d at 935; State v.
Whittenburg, 265 S.W.2d 569, 572-73 (Tex. 1954); State v. Houser, 156 S.W.2d 968, 970-71 (Tex.
1941).

 In Enron, the Texas Supreme Court recognized that the legislature has discretion to impose
different methods for determining market value: "Although the considerable leeway given to the Legislature
in levying sales, occupation, and excise taxes is not as broad in the area of ad valorem taxes, there is no
constitutional impediment to utilizing differing methods for determining market value for ad valorem tax
purposes." 922 S.W.2d at 936. Although the supreme court did not stress it, the breadth of the
legislature's discretion in the area of value determination may arise in part from the constitutional mandate
that "value . . . shall be ascertained as may be provided by law." Tex. Const. art. VIII, §1(b). The phrase
"as may be provided by law," when used in a constitutional provision establishing a general legal principle
or administrative framework, has been held to "clearly vest[] the Legislature with the authority to exert
substantial control over the mechanics of [the subject matter addressed]." McAvoy v. H.B. Sherman Co.,
258 N.W.2d 414, 425 (Mich. 1977); see also State v. Rodrigues, 629 P.2d 1111, 1114 (Haw. 1981);
Wann v. Reorganized Sch. Dist. No. 6, 293 S.W.2d 408, 411 (Mo. 1956); State ex rel. Agnew v.
Schneider, 253 N.W.2d 184, 187 (N.D. 1977); cf. Hardin v. Central Am. Life Ins. Co., 374 S.W.2d
881, 884 (Tex. 1964) (legislature has right to provide for method of determining valuation to be placed on
assets of insurance companies for taxation purposes).

 The District contends section 23.12(a) is constitutionally infirm because, by limiting potential
purchasers to those who would continue the business of selling the goods that make up the inventory, the
statute imposes an "artificial" market on the valuation of inventory that does not produce true market value. 
This view again appears to be based largely on the District's position that multiplying the number of subunits
of property by the retail price for each individual subunit is the only way to produce a reasonable estimate
of the market value of the whole. Although we have addressed that issue in the preceding section of this
opinion, it is worth revisiting briefly here. Because value is a point-in-time estimate, the very concept of
market value seems to contemplate what a willing buyer would pay for the whole property in a single
transaction, not multiple transactions spread over time. Indeed, both the statutory and case-law definitions
of "market value" refer to a single purchaser. See Code § 1.04(7); State v. Windham, 837 S.W.2d at
77; State v. Carpenter, 89 S.W.2d 979, 980 (Tex. 1936). The issue, therefore, is not whether it is
reasonable to assess property as a unit. Rather, the issue is whether the process of adding together the
market values of all the subunits that make up the larger tract is, as the District contends, the only way to
produce a reasonable estimate of the market value of the whole. In some circumstances, such an approach
might be proper. But where the subunits are simply held as inventory for the sole purpose of being sold
in the regular course of a business in order to produce a profit, then the value of owning those subunits
arises only from the income they will produce and not from the "usual" bases of value such as the amenities
and personal pleasures derived from owning and occupying the property. In those circumstances, it is
neither unreasonable nor arbitrary for the legislature to require a unit valuation.

 Thus, as explained above, courts, commentators, and professional appraisers generally
reject the idea that simply adding together the market values of subunits will, without more, produce the
market value of the whole. "The identification of the value of any given property off the market place with
an amount determined by the current sale prices of units of similar property traded in on the market place,
is so frankly arbitrary that it would be beside the point to argue whether or not it is a 'true' definition of
value." 1 James C. Bonbright, The Valuation of Property 48 (1937).

 Moreover, the "development approach" discussed above does consider the retail price of
the subdivided lots. That approach merely requires that various development and marketing costs of selling
the individual lots also be considered. In using the "income approach" to determine the market value of
traditional income-producing property, the expenses of producing such income must always be deducted
to arrive at net income. See, e.g., The Appraisal of Real Estate 362 (Amer. Inst. of Real Estate
Appraisers, 8th ed. 1983); J. D. Eaton, Real Estate Valuation in Litigation 119-20 (Amer. Inst. of Real
Estate Appraisers 1982); Clifford W. Hollebaugh, Income Approach to Value, in Encyclopedia of Real
Estate Appraisal 54-56 (Edith J. Friedman ed., 1959). Given the conceptual similarity between real estate
inventory and traditional income-producing property, applying such a requirement to real estate inventory
cannot be said to be unreasonable, arbitrary, or capricious.

 The constitutional issue is not simply whether section 23.12(a) restricts the market, but
whether the restriction fails to produce a reasonable estimate of market value. As pointed out above, an
owner of business inventory--whether real or personal property--is necessarily interested primarily in the
financial benefit that the retail sale of the inventory will bring in the future. The standard definition of value
applied to income-producing property is the present worth of future benefits expected to be derived from
ownership: "Because value is created by the expectation of benefits to be derived in the future, value may
be defined as the present worth of all rights to these future benefits. All income capitalization methods,
techniques, and procedures attempt to forecast future benefits and estimate their present value." The
Appraisal of Real Estate 408 (Amer. Inst. of Real Estate Appraisers, 9th ed. 1987); see also Real Estate
Appraisal Terminology 215 (Amer. Inst. of Real Estate Appraisers & Soc'y of Real Estate Appraisers,
Byrl N. Boyce ed.,1975) ("Value is the present worth of future benefits arising out of ownership to typical
users or investors."). By directing that inventory be valued at "the price for which it would sell as a unit to
a purchaser who would continue the business," section 23.12(a) essentially requires nothing more than that
the inventory of a business should, for taxation purposes, be considered as income-producing property
and its market value determined pursuant to the income approach.

 Finally, in the appraisal process, a recognition of the appropriate market is not only
common, but essential:


 Although there is a remarkable similarity in the many definitions of fair market
value, the definitions leave several questions unanswered. For example, the exact market
to be considered to find the proper fair market value may vary depending on the nature of
the property interest, the status of the owner, the volume of assets ordinarily sold, and the
availability of wholesale or retail markets. The market to be considered should generally
be that which the owner of a given property would ordinarily use, but in some instances,
statutes or regulations may dictate that a particular market be considered.



Goff, supra, 15 Tex. Tech L. Rev. at 641; see also Daniel S. Goldberg, Fair Market Value in the Tax
Law: Replacement Value or Liquidation Value, 60 Tex. L. Rev. 833, 834 (1982) ("[A] determination
of fair market value under the willing buyer/willing seller test cannot be made without first knowing the
market in which the transaction will take place."). Where one is seeking to estimate what a willing buyer
would pay for roughly 200 subdivided residential lots in a single transaction, the "retail market" would not
be a good place to look. Thus, restricting potential buyers to those who would continue the business of
selling the inventory to retail customers is simply a recognition that such business purchasers would pay the
highest price for the inventory sold as a unit.

 Moreover, to the extent it is relevant, FM produced evidence that there is an active, existing
market in multi-lot sales and purchases out of subdivisions in Travis County. Thus, as far as the present
case is concerned, the market designated by the legislature in section 23.12(a) is not an imaginary one, but
a real one.

 Based on the foregoing, we hold that the market "restriction" recognized by section
23.12(a) produces a reasonable estimate of market value and does not, therefore, violate the "in proportion
to its value" provision contained in article VIII, section 1(b) of the Texas Constitution.


III. Exemption

 Finally, the District argues that section 23.12(a) constitutes an unauthorized "exemption"
from taxation for owners of real estate inventory. Because article VIII, section 2 of the Texas Constitution
does not authorize an exemption for such property, the District contends the statute is unconstitutional.

 Enron also forecloses this argument. The supreme court held in Enron that a statute fixing
a standard of valuation of inventory did not create an exemption at all where the statute did not delete the
property from the tax rolls entirely. 922 S.W.2d at 940-41. The present case is almost identical to Enron
in that respect: section 23.12(a) did not delete FM's property from the tax rolls entirely, but merely
established a method of valuing a certain category of property, which FM's land falls into. See Hardin,
374 S.W.2d at 884. Accordingly, we hold that section 23.12(a) does not violate article VIII, section 2
of the constitution.

CONCLUSION

 Because section 23.12(a) does not create an unreasonable tax classification, it does not
violate article VIII, section 1(a) of the Texas Constitution; because it does not establish an arbitrary or
capricious method of valuation that departs from the market-value standard, it does not violate article VIII,
section 1(b); because it does not exempt real estate inventory from taxation, it does not violate article VIII,
section 2. We affirm the trial court's judgment.



 J. Woodfin Jones, Justice

Before Justices Powers, Aboussie and Jones

Affirmed

Filed: June 26, 1997

Publish
1. Amendments to section 23.12(a) in 1993 and 1995 resulted in the addition of the introductory
phrase, "Except as provided by Sections 23.12A and 23.12D of this code . . . ." See Act of May 25,
1993, 73d Leg., R.S., ch. 672, § 1, 1993 Tex. Gen. Laws 2501, 2501; Act of May 27, 1995, 74th Leg.,
R.S., ch. 836, § 1, 1995 Tex. Gen. Laws 4231, 4231. Section 23.12A, since renumbered as section
23.121, provides: "For the purpose of the computation of property tax, the market value of a dealer's
motor vehicle inventory on January 1 is the total annual sales from the dealer's motor vehicle inventory, less
sales to dealers, fleet transactions, and subsequent sales, for the 12-month period corresponding to the
prior tax year, divided by 12." Code § 23.121(b) (West Supp. 1997). Section 23.12D provides the same
method of computation of value for a dealer's vessel and outboard motor inventory. See Code §
23.12D(b) (West Supp. 1997).
2. The development approach has also been variously referred to as the "cost of development
method," "anticipated use method," "lot method," "developer's residual approach," "developer's
absorption method," and "subdivision approach." For purposes of consistency only, we will refer to it as
the development approach.
3. The development approach has been discussed in one Texas opinion, although it was not critically
evaluated in that case because the parties did not contest its validity. See Cherokee Water Co. v. Gregg
County Appraisal Dist., 773 S.W.2d 949, 954 (Tex. App.--Tyler 1989), aff'd, 801 S.W.2d 872 (Tex.
1990).
4. "Under the income approach, an appraiser or other witness calculates the economic rent the
property will command in the open market, deducts normal operating expenses to arrive at net operating
income, and then capitalizes the net operating income by a rate of return to arrive at an opinion of fair
market value." 5 Nichols on Eminent Domain § 19.01[2] at 19-8 (rev. 3d ed. 1997, Julius L. Sackman,
co-author).
5. Using the income approach to find market value of real estate inventory is not inconsistent with
the restriction in section 23.12(a) that the property "produce[] no income," because the purpose of that
statutory restriction is obviously to exclude real estate that produces income while owned.



les and purchases out of subdivisions in Travis County. Thus, as far as the present
case is concerned, the market designated by the legislature in section 23.12(a) is not an imaginary one, but
a real one.

 Based on the foregoing, we hold that the market "restriction" recognized by section
23.12(a) produces a reasonable estimate of market value and does not, therefore, violate the "in proportion
to its value" provision contained in article VIII, section 1(b) of the Texas Constitution.


III. Exemption

 Finally, the District argues that section 23.12(a) constitutes an unauthorized "exemption"
from taxation for owners of real estate inventory. Because article VIII, section 2 of the Texas Constitution
does not authorize an exemption for such property, the District contends the statute is unconstitutional.

 Enron also forecloses this argument. The supreme court held in Enron that a statute fixing
a standard of valuation of inventory did not create an exemption at all where the statute did not delete the
property from the tax rolls entirely. 922 S.W.2d at 940-41. The present case is almost identical to Enron
in that respect: section 23.12(a) did not delete FM's property from the tax rolls entirely, but merely
established a method of valuing a certain category of property, which FM's land falls into. See Hardin,
374 S.W.2d at 884. Accordingly, we hold that section 23.12(a) does not violate article VIII, section 2
of the constitution.

CONCLUSION

 Because section 23.12(a) does not create an unreasonable tax classification, it does not
violate article VIII, section 1(a) of the Texas Constitution; because it does not establish an arbitrary or
capricious method of valuation that departs from the market-value standard, it does not violate article VIII,
section 1(b); because it does not exempt real estate inventory from taxation, it does not violate article VIII,
section 2. We affirm the trial court's judgment.



 J. Woodfin Jones, Justice

Before Justices Powers, Aboussie and Jones

Affirmed

Filed: June 26, 1997

Publish
1. Amendments to section 23.12(a) in 1993 and 1995 resulted in the addition of the introductory
phrase, "Except as provided by Sections 23.12A and 23.12D of this code . . . ." See Act of May 25,
1993, 73d Leg., R.S., ch. 672, § 1, 1993 Tex. Gen. Laws 2501, 2501; Act of May 27, 1995, 74th Leg.,
R.S., ch. 836, § 1, 1995 Tex. Gen. Laws 4231, 4231. Section 23.12A, since renumbered as section
23.121, provides: "For the purpose of the computation of property tax, the market value of a dealer's
motor vehicle inventory on January 1 is